David S. Stone
Robert A. Magnanini
Amy W. Wagner
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ 07078
Tel: (973) 218-1111
Fax: (973) 218-1106
*Attorneys for Plaintiffs James A. Wiatt*
*and Elizabeth Rieger Wiatt*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES A. WIATT and ELIZABETH RIEGER WIATT, <br><br> Plaintiffs, <br><br> v. <br><br> WINSTON & STRAWN LLP, JONATHAN S. BRISTOL, STARR & COMPANY, LLC, STARR INVESTMENT ADVISORS, LLC, AURORA CASSIRER, ESQ., AS RECEIVER FOR STARR & COMPANY, LLC and STARR INVESTMENT ADVISORS, LLC, KENNETH I. STARR, ARLENE M. GRAFF, and DOES 1-10, <br><br> Defendants. | Civil Action No. <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs James A. Wiatt ("Jim Wiatt") and Elizabeth Rieger Wiatt ("Elizabeth Wiatt") (collectively the "Wiatts" or "Plaintiffs"), by and through their attorneys Stone & Magnanini LLP, make the following factual allegations applicable to each cause of action pled herein:

1

## INTRODUCTION

1.     This is an action by the Wiatts seeking compensation and other relief for the naked theft of their money by Defendants Kenneth Starr ("Starr"), Arlene M. Graff ("Graff"), Starr & Company, LLC and Starr Investment Advisors, LLC, Jonathan Bristol ("Bristol") and Winston & Strawn LLP ("Winston & Strawn"), and Does 1-10 (collectively the "Defendants"), and Aurora Cassirer, Esq., Receiver Starr & Company, LLC and Starr Investment Advisors, LLC ("Receiver").

2.     Starr is a former financial advisor, investment manager and accountant to the stars who has recently pled guilty to numerous felonies relating to the theft of tens of millions of dollars from his celebrity clients.  Starr not only managed the Wiatts' accounts and provided them with financial advice, but he also cultivated a close personal friendship with Jim Wiatt.

3.     Winston & Strawn is a multi-national law firm with offices in New Jersey, New York and throughout the globe.

4.     Bristol was a Winston & Strawn partner who simultaneously represented the Wiatts and the Starr Defendants (as defined below) and facilitated the Starr Defendants' theft of $2 million of the Wiatts' funds using his attorney trust account in TD Bank in Chatham, New Jersey (the "Attorney Trust Account").

5.     Subsequent to assisting with the theft of this money, Winston & Strawn and Bristol offered to and did represent the Wiatts in discussions with the United States Securities and Exchange Commission ("SEC") regarding the investigation of the Starr Defendants' crimes. Neither Starr, Winston & Strawn, or Bristol revealed to the Wiatts that Starr's activities with Bristol were involved in the SEC's investigation at the time.

2

6.      Bristol has been charged in an unsealed Indictment with laundering in excess of $20 million in connection with Starr's felonies and has surrendered to law enforcement.  He has also been named in an Amended Complaint filed by the SEC.

## THE PARTIES

7.      Plaintiff Jim Wiatt is, and at all relevant times was, a resident of Pacific Palisades, California.

8.      Plaintiff Elizabeth Wiatt is, and at all relevant times was, a resident of Pacific Palisades, California.

9.      Defendant Starr & Co. (formerly known as Starr & Company Financial Consultants, LLC) is a New York limited liability company, with its principal office in New York, New York.   Starr & Co. held itself out to Plaintiffs as a firm of accountants, CPAs, business managers, investment managers, investment advisors, financial planner/consultants, and attorneys that provided bookkeeping, accounting, auditing, investment management, investment advisory, financial (including tax) planning/consulting, tax preparation, business management, and legal services.

10.     Defendant Starr Investment Advisors, LLC ("SIA") is a Delaware limited liability company with its principal office in New York, New York.  SIA is registered with the SEC as an Investment Advisor and represents to the SEC that it provides financial planning services, portfolio management for individuals, and the selection of other advisers to its clients.  SIA is a wholly-owned subsidiary of Starr & Co.

11.     Defendant Aurora Cassirer, Esq. is the Receiver for Starr & Company, LLC, Starr Investment Advisors, LLC and other parties in the action styled *SEC v. Kenneth Ira Starr, et al.* Docket No. 10-cv-4270-SHS in the United States District Court for the Southern District of New

3

York.   The Receiver was appointed by the Southern District of New York pursuant to the Court's Orders dated June 7, 2010 and July 8, 2010.  Plaintiffs believe that the Receiver may be served with process by and through her attorney, Lee W. Stremba, Esq. of Troutman Sanders LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174.

12.     Defendant Starr is a resident of the State of New York.  At all relevant times, Starr was a certified public accountant licensed by the State of New York and an attorney admitted to practice law before the New York State Bar.  At all relevant times, Starr held himself out to Plaintiffs as an accountant, CPA, business manager, investment manager, investment advisor, financial consultant, and attorney.  On information and belief, at all relevant times, Starr was the 100% owner (through both direct and indirect interests), sole member, President, and CEO of Defendant Starr & Co.

13.     Defendant Graff is a resident of the State of New York and at all relevant times was a principal of Starr & Co.  At all relevant times, Graff held herself out to Plaintiffs as an accountant, CPA, business manager, investment manager, investment advisor, and financial consultant.

14.     Defendants Does 1-10 are parties whose true names and capacities are currently unknown.  On information and belief, Does 1-10 are in some manner responsible for the injuries sustained by Plaintiffs and/or are Starr & Co.'s predecessors-in-interest, successors-in-interest, partners, agents, principals, employees, employers, parent corporations, subsidiary corporations, members, instrumentalities, alter egos, conduits, joint ventures, co-conspirators, aiders and abettors, or connected with, and/or legally responsible for, the actions of Starr & Co. and Ken Starr.  On information and belief, Does 1-10 may include Starr & Company, PC, Starr & Company, LLP, Kisco CPA, PC f/k/a Starr & Company CPA, PC, and/or Kisco Holdings, Inc.

4

15.     Defendants Starr & Co., SIA, and Does 1-10, are collectively referred to as the "Starr Entities."  The Starr Entities, together with Starr and Graff, are collectively referred to as the "Starr Defendants."

16.     Defendant Winston & Strawn is an Illinois limited liability partnership engaged in the practice of law at various locations in the United States and Europe.  At all relevant times, Winston & Strawn has had offices in Newark, New Jersey and New York, New York.

17.     Defendant Bristol is, and at all relevant times was, a resident of Chatham, New Jersey.  At all relevant times, he was an attorney licensed to practice law before the New Jersey and New York State Bars.  At all relevant times, Bristol was a "Capital Partner" at Winston & Strawn who generated business and performed services for clients in his capacity as a Capital Partner of Winston & Strawn in both New Jersey and New York.  The work performed by Winston & Strawn attorneys on behalf of Plaintiffs was performed in New Jersey and New York.

18.     Winston & Strawn and Bristol are collectively referred to as the "Winston & Strawn Defendants."

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000, exclusive of interest and costs, and federal question jurisdiction under 18 U.S.C. § 1964(c).

20.     Venue of the following claims is laid in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims herein occurred in the District of New Jersey.

## FACTUAL ALLEGATIONS

### A. The Wiatts' Relationship with Starr

21.     Jim Wiatt is a former executive of a talent agency and is now a consultant for a leading global web services company.  Elizabeth Wiatt is a businesswoman and entrepreneur.

22.     In 2003, Starr, a non-practicing attorney and financial adviser to the stars, was in the business of managing famous, high net worth clients' money, particularly clients in the entertainment industry.

23.     From August 2003 until late May 2010, the Wiatts engaged Starr and the Starr Defendants to manage all aspects of their personal finances.  This included accounting, business management, investment management, investment advice, financial consulting, financial planning, and tax advice.  The Starr Defendants were also involved with assisting the Wiatts with the selection and utilization of other professionals, such as bankers, realtors, and lawyers.  The Wiatts placed their complete trust in Starr and gave him access to and control of the majority of their significant financial assets.

24.     For the performance of these services, the Wiatts paid the Starr Defendants substantial professional service fees on a monthly basis.

25.     During that time period, officials of the Starr Entities, including but not limited to Starr and Graff, had signatory authority over the Wiatts' bank and/or investment accounts as well as trusts and corporate entities which one or both of the Wiatts controlled.

26.     For instance, from at least in or around August 2003 through on or about May 27, 2010, Starr and Graff each had signatory authority and power of attorney over the Wiatts' joint checking account at City National Bank located in Beverly Hills, California (the "Management

6

Account"). Moreover, at all relevant times, monthly account statements for the Management Account were sent to Starr & Co.'s offices and not to the Wiatts.

27.     Indeed, Jim Wiatt's paychecks and all of the Wiatts' bills were sent to the Starr Defendants, including Starr and Graff, who paid the Wiatts' personal bills out of the Management Account and disbursed all checks.

28.     On a monthly basis, and usually at the end of the following month, the Starr Defendants provided the Wiatts with a financial report that provided details for each of the Wiatts' accounts, such as a balance sheet, a portfolio allocation, an investment allocation, an investment performance, their stock options, income and expenses, receipts and disbursements, a major expense analysis, and a description of investments.

29.     Moreover, since 2003, Starr fostered a close personal friendship with Jim Wiatt. This friendship grew, prospered, and suddenly evaporated on the day of Starr's arrest, the day after Starr and Wiatt met for drinks with some mutual friends. In fact, on the morning of Starr's arrest, Wiatt sent Starr an email stating in part "Sorry I didn't get to the office. Will next trip. Appreciate your friendship and advice."

30.     As set forth more fully herein, it turned out that Starr's friendship with Wiatt was based upon deceit.

**B. The Starr Defendants' Relationship with Bristol**

31.     It appears that Starr, along with the other Starr Defendants, had a long-term relationship with Bristol. Prior to joining Winston & Strawn in 2008, Bristol represented Starr and his companies as a partner in the Florham Park, New Jersey office of the Thelen LLP law firm. It is believed that Bristol has represented the Starr Defendants since at least 2007.

7

32.     From in or around 2003 through 2008, Bristol was a real estate and corporate transactions partner at Thelen LLP and worked out of its Florham Park, New Jersey office. Bristol was previously a partner with the law firm of Day Pitney LLP and worked out of its Morristown, New Jersey office.  Throughout this time, Bristol was also a Member of the New Jersey Supreme Court Office of Attorney Ethics.

33.     While a partner at Thelen LLP, Bristol acquired the Starr Defendants as clients.

34.     In or about November 2008, Winston & Strawn hired Bristol and eighteen other lawyers from Thelen LLP, which was dissolving.

35.     Winston & Strawn hired Bristol as a "Capital Partner" and expected that he would generate sufficient business and revenue for the firm to justify his substantial compensation.

36.     Upon hiring Bristol, an article was published boasting that Bristol was bringing his valuable and famous Starr clients with him to continue his practice at Winston & Strawn.

37.     Bristol allegedly bragged to his colleagues about his relationship with Starr and the volume of Starr's business.

38.     Indeed, Bristol performed substantial work on behalf of the Starr Defendants, which generated over $1 million in legal fees for Winston & Strawn in 2009 alone. *See* Bristol's criminal Indictment (attached hereto as Exhibit A) at ¶ 7.

39.     Furthermore, on or about March 17, 2010, Winston & Strawn received a $100,000 payment for services that was purportedly from Starr.  However, the $100,000 in fact came from Bristol's attorney trust account, which Bristol knew belonged to defrauded clients of Starr. *Id.* at ¶ 16.

40.     Consequently, Winston & Strawn directly benefited from Bristol's representation of the Starr Defendants and their business which they brought to Winston & Strawn.

8

## C. Jim Wiatt Retains the Winston & Strawn Defendants

41.     In addition to representing the Starr Defendants, Winston & Strawn and Bristol also represented the Wiatts.

42.     In or around late October 2009, Jim Wiatt sought legal advice in connection with his departure from his employment at the William Morris Agency.  Jim Wiatt asked Starr, as his business manager, for a recommendation for a lawyer to advise Wiatt on his legal rights.

43.     Starr referred Jim Wiatt to Bristol whom he described as a good friend and a successful partner at Winston & Strawn.

44.     Starr did not disclose to the Wiatts that the Winston & Strawn Defendants also represented most, if not all, of the Starr Defendants and never disclosed that they represented Starr in his individual capacity.

45.     Relying upon Starr's recommendation, Bristol's credentials, and the reputation of Winston & Strawn, on or about October 29, 2009, Jim Wiatt engaged the Winston & Strawn Defendants to provide him with legal services and advice regarding his separation agreement with the William Morris Agency.  He did so by way of e-mail exchange with Bristol on Bristol's Winston & Strawn's e-mail account.  Bristol conveyed to Jim Wiatt that he was honored to represent him and hoped that it would lead to other business opportunities.

46.     Thereafter, Bristol, on behalf of and as a partner of Winston & Strawn, provided Jim Wiatt with legal services on a variety of matters until in or around late May 2010.

47.     All of Bristol's communications with Jim Wiatt were through his email account at Winston & Strawn, in writing on Winston & Strawn letterhead, or by telephone.  Also, at various times when Jim Wiatt called Bristol at Winston & Strawn, Wiatt spoke with other Winston & Strawn employees in his efforts to contact Bristol.

9

48.     During the course of his representation of Jim Wiatt, Bristol provided Jim Wiatt with legal advice, upon which Jim Wiatt relied.  At all times Jim Wiatt considered Bristol and Winston & Strawn his attorneys and believed Bristol was always acting in his best interests as his client.

49.     Within the scope of the Winston & Strawn Defendants' representation of the Wiatts, Bristol first advised Jim Wiatt as to responsibilities of a board member for public and private companies.

50.     Bristol also provided contract negotiation assistance and advice regarding potential conflicts of interest.

51.     For example, in or around February 2010, Bristol extensively revised an indemnification agreement between Jim Wiatt and OneCast, Inc., which was saved on Winston & Strawn's network in numerous drafts with DocsOpen in February 2010.  This specific agreement also identified that Bristol was to be copied on any notice or communications with Jim Wiatt related to the agreement.  It listed the following contact information at Winston & Strawn:

Jonathan Bristol, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Office: 212.294.4747
Email: jbristol@winston.com

52.     Bristol also prepared at least two legal memoranda for Jim Wiatt relating to complex legal employment and corporate issues on January 5 and 6, 2010, respectively (each an "Internal Memorandum").  These memoranda were written on Winston & Strawn letterhead, designated as "Attorney-Client Privileged" materials, and saved on Winston & Strawn's network with the firm's DocsOpen software .

53.     The January 5, 2010 Internal Memorandum from Bristol to Jim Wiatt, on Winston & Strawn letterhead and designated "Confidential: Attorney Client Privileged Communication or Work Product," is a five (5) page memo addressing Jim Wiatt's separation agreement with a former employer.  Similarly, the January 6, 2010 Internal Memorandum from Bristol to Jim Wiatt, on Winston & Strawn letterhead and designated Confidential: Attorney Client Privileged Communication or Work Product, is a three (3) page memo addressing additional aspects of Jim Wiatt's separation agreement with a former employer.  Surrounding the provision of these memoranda, Bristol and Jim Wiatt exchanged numerous emails which also included Bristol's office, mobile, and home numbers.

54.     Bristol also prepared documents for Jim Wiatt involving his membership on a board and a consultancy agreement.

55.     In addition, in one instance in our around March 2010, Jim Wiatt had indicated to Bristol that he was dissatisfied with one of his investments that Starr had arranged with Starr's close friend and business associate Keith Barish.  In response, Bristol told Jim Wiatt that he would try to get his money back for him and to identify any other investments for which he wanted to have his money returned.

56.     Throughout the course of Bristol's representation, Bristol communicated with the Starr Defendants to obtain relevant documents that they maintained on behalf of the Wiatts, such as the separation agreement and investment records.  As with their involvement with other professionals, at times the Starr Defendants communicated directly with Bristol on behalf of the Wiatts.

57.     For instance, on December 7, 2009, Bristol reviewed a Google/YouTube Inbound Services Agreement with Jim Wiatt and emailed Starr and Graff regarding suggested revisions.

11

Graff then forwarded the email to Jim Wiatt.  Bristol also prepared a draft email for Jim Wiatt to adopt and send in connection with this agreement.  Bristol made additional suggestions with respect to this agreement between December 14 and 15, 2009.

58.     As set forth in more detail below, Bristol also represented the Wiatts in coordinating an interview with the SEC that was, unbeknownst to the Wiatts, related to wire transfers from the Wiatts' account into Bristol's Attorney Trust Account in New Jersey.  The SEC exchanged numerous emails and telephone calls with Bristol at Winston & Strawn, involving his representation of the Wiatts.

59.     Even while representing the Wiatts before the SEC, and up through May 26, 2010, the day before Starr was arrested hiding in his bedroom closet, Bristol continued to provide Jim Wiatt with legal advice concerning his separation agreement.

### D. The Starr Defendants and Winston & Strawn Defendants Steal $2,000,000 from the Wiatts

60.     Sometime in 2010, while Bristol was acting as the Wiatts' attorney, he conspired with the Starr Defendants to steal $2 million of the Wiatts' money for Starr's personal use.  The Starr Defendants and Bristol conspired with one another to steal the Wiatts' and other Starr clients' money for the purpose of purchasing lavish extravagances for Starr such as a $7.5 million apartment on the Upper East Side of Manhattan.

61.     With Bristol's assistance, Bristol's Attorney Trust Account at a TD Bank branch in Chatham, New Jersey, was used as the vehicle to facilitate these illicit transfers, stealing tens of millions of dollars from his unsuspecting clients.

62.     In particular, in 2010, the Starr Defendants twice unlawfully and without authorization, transferred $1,000,000 of the Wiatts' money (for a total of $2,000,000) from the Management Account to Bristol's Attorney Trust Account.

12

63.     Specifically: (i) Graff executed a wire transfer of $1,000,000 from the
Management Account to the Attorney Trust Account on or about January 4, 2010 (the "January
Transfer"); and (ii) Starr executed a wire transfer of $1,000,000 from the Management Account
and into the Attorney Trust Account on or about April 26, 2010 (the "April Transfer").

64.     Bristol was certain that these two $1,000,000 wire transfers were from his client's
account, to whom he owed fiduciary duties, because, among other reasons, the bank records
Bristol received indicated that the source of the funds were from Jim and Elizabeth Wiatt.

65.     In clear violation of Bristol's fiduciary duties, both the January Transfer and the
April Transfer were made without the knowledge or approval of the Wiatts.

66.     Once received by Bristol into the Attorney Trust Account, the moneys stolen
through the January Transfer and the April Transfer were then transferred from the Attorney
Trust Account, and then further converted for the Starr Defendants' own use and purposes.  In
particular, these moneys were immediately wired back out of the Attorney Trust Account to Starr
& Co. and/or other third-parties believed to be Starr clients to perpetuate the Starr Defendants'
ongoing scheme to defraud their clients, including the Wiatts.

67.     The Starr Defendants and Bristol failed to disclose the existence of these transfers
to the Wiatts, and, when the Wiatts learned of the transfers, the Starr Defendants and Bristol
made material misrepresentations about the true purpose of the transfers although they knew the
funds were not being used for the Wiatts' benefit as they represented to the Wiatts.

### 1) *The January Transfer*

68.     On or around January 4, 2010, Graff, on behalf of the Starr Entities, wired
$1,000,000 out of the Management Account and, effective January 5, 2010, into Bristol's
Attorney Trust Account.

69.     The Wiatts did not learn about this transfer until in or around March 2010, when they received from the Starr Defendants their monthly financial report for the period ending January 31, 2010.

70.     This financial report falsely describes the $1,000,000 wire transfer as a "check" sent to Jonathan Bristol as an "investment" in "UBS." This is false because the $1,000,000 was never sent to UBS.

71.     After reviewing this account ledger, on or about March 10, 2010, Jim Wiatt asked Graff about this transaction, and she falsely informed him that this money was "bundled" along with $4,000,000 from other clients for an investment.

72.     When Jim Wiatt advised Graff that he did not know or approve of any such investment, Graff told him that Starr had discussed the investment with him.

73.     Jim Wiatt also questioned Starr and was advised that they were "bundling" the money with other client funds for a collective investment at UBS, which would yield better rates.

74.     In or around May 12, 2010, Jim Wiatt questioned Bristol about the January Transfer. Like Graff and Starr before him, Bristol also falsely informed Jim Wiatt that the $1,000,000 was being "bundled" for an investment at UBS. "In truth and in fact, however, and as Bristol well knew, the $1 million had been misappropriated by Starr." *See* Exhibit A at ¶ 12.

75.     Since September 2009, Jim Wiatt had repeated discussions with Starr about investing funds with his close friend at UBS in California and had even introduced this friend and Starr. In or around January 2010, Jim Wiatt specifically informed Starr that he wished to invest $2,000,000 with his friend at UBS. Although Jim Wiatt had repeatedly requested that Starr transfer $2,000,000 to his friend at UBS, such representation by Bristol, Starr and Graff that this was an investment at UBS was misleading and false, as no such investment involving

14

the "bundling" of "$1,000,000" was ever discussed or authorized, and no money was transferred to anyone at UBS in January 2010 as Jim Wiatt ultimately learned.

76.     While Jim Wiatt did not understand precisely why his attorneys would be involved in the bundling of investment monies, he did not pursue the matter further because he trusted the Winston & Strawn Defendants and the Starr Defendants as his fiduciaries, did not know or believe they would be embezzling his money, and assumed that they were acting in his best interests as they should.

77.     To the contrary, Starr knew he could persuade Wiatt that the investment was being made with UBS because Starr knew that Wiatt trusted him and that Wiatt was expecting him to send money to UBS.

78.     This specific wire transfer subsequently became a subject of Starr's September 10, 2010 guilty plea, wherein he stated: "on or about January 5, 2010, I transferred a million dollars of one client's money to the attorney trust account and later used that for money for my own purposes." *See* the Starr Plea Agreement (attached hereto as Exhibit B) at 16.

79.     This wire transfer and Bristol's misrepresentations concerning the transfer are also listed as part of Bristol and Starr's money laundering schemes in an unsealed Indictment against Bristol. *See* Exhibit A.

### 2) *The April Transfer*

80.     After months of requesting that Starr provide his friend at UBS with money with which to invest, Jim Wiatt signed a letter dated April 26, 2010—prepared by Starr & Co. and on Starr & Co. letterhead—authorizing the payment of $2,000,000 to that individual at UBS. He never before had to sign this type of letter, but Jim Wiatt did not question the request by the Starr Defendants.

81.     The Starr Defendants did not transfer the $2,000,000 to that individual at UBS as Jim Wiatt directed.

82.     Instead, on or about April 26, 2010—the date of Jim Wiatt's authorization letter—Starr, unbeknownst to the Wiatts, executed another wire transfer of $1,000,000 from the Management Account to Bristol's Attorney Trust Account, and only transferred $1,000,000 to UBS.

83.     As with the January Transfer, this transfer was done without the Wiatts' knowledge or approval.

84.     Jim Wiatt was eventually informed by UBS that they had only received $1,000,000 of the $2,000,000 that they expected to receive.  When Jim Wiatt confronted Starr about this, Starr explained that he was spreading out the $2,000,000 wire transfer in two separate transactions.  At the time, Jim Wiatt did not know that Starr and Bristol had already taken the money stolen through the April Transfer and given it to another of Starr's clients.

85.     In fact, the Wiatts did not learn about the April Transfer to Bristol until late May 2010, when it was referenced in criminal and civil complaints filed against Starr and related entities.  As set forth in those pleadings, the Defendants used the proceeds of the April Transfer to pay another Starr client, believed to be the actress Uma Thurman, from whom Starr had previously stolen $1,000,000 to pay for a $7.5 million condominium for Starr and his wife.

86.     Specifically, the unsealed verified complaint filed by the Government demonstrates that one of Starr's celebrity clients, believed to be Uma Thurman, learned from her bank that $1,000,000 had been wired out of her account and into Bristol's attorney trust account.  *See* the Starr criminal Complaint (attached hereto as Exhibit C).  With the assistance of her legal team, she confronted Starr in his office and demanded an explanation for the $1,000,000 wire to

Bristol's attorney trust account. *See id.* ¶14(h). Starr claimed it was for an investment that did not go through. *See id.*

87.   As set forth in the criminal complaint:

(a)   Despite his client's request to contact Bristol and have the money returned, Starr claimed that Bristol could not be reached. The client's legal team took action and contacted Bristol directly at Winston & Strawn about her money sitting in his trust account. *See id.*

(b)   Bristol claimed to have no knowledge that the funds belonged to her and stated that he thought they belonged to Starr. He explained that Starr "bungled [him] up on this" and agreed to get the $1,000,000 back to her account. *See id.*

(c)   This celebrity client's funds apparently were no longer even in Bristol's Attorney Trust Account. Thus, in order to transfer the $1,000,000 back to this client, Bristol had to find another $1,000,000. In a classic example of "robbing Peter to pay Paul," Starr stole $1,000,000 from the Wiatts' account and transferred it into Bristol's attorney trust account. *See id.* ¶¶14(h) - 15.

(d)   After a series of follow up telephone conversations that day in which Bristol continuously updated the other client on his progress in returning her money, the $1,000,000 was finally transferred back to the other client's account thanks to the funds stolen from the Wiatts. *See id.* ¶14(i).

88.   Although Bristol had an ongoing attorney-client relationship with Jim Wiatt, and should have been advancing the interests of his client, Bristol nevertheless breached his fiduciary duties to Jim Wiatt when he obtained the Wiatts' funds to "reimburse" Starr's celebrity client.

89.   On or around May 15, 2010, Jim Wiatt contacted Bristol, as his attorney, for an explanation of the circumstances surrounding the January and April 2010 wire transfers by Starr into Bristol's attorney trust account. Bristol again told Wiatt that the wire transfers to the trust account were made to facilitate the bundling of investments with UBS and that this was routine. Despite Wiatt directly asking him about the $1,000,000 wire transfer, Bristol concealed the fact that he used the April 2010 wire transfer to fulfill his promise to reimburse another Starr client.

90.     On May 27, 2010, the day of Starr's arrest, Jim Wiatt made multiple attempts to reach Bristol at his office and cell phone numbers and via email to discuss the reasons for the wire transfers, Bristol's involvement, where, when, and how much money was distributed. Notwithstanding his portrayal as Jim Wiatt's trusted attorney, Bristol never responded to Wiatt.

91.     After Starr's arrest, Jim Wiatt spoke with Graff and she claimed she did not know what happened.

92.     This $2,000,000, converted by Defendants for their own purposes from the Wiatts' account, has never been accounted for or returned.

### E.  Wiatt Engages the Winston & Strawn Defendants in Connection with the SEC Investigation

93.     In or around mid-May 2010, an attorney in the Enforcement Division of the Securities and Exchange Commission tried to contact Jim Wiatt through the general counsel of a company for which Wiatt was working.

94.     The SEC attorney left a message asking for a return call but did not identify the subject matter that he wished to discuss.

95.     Wiatt discussed the issue with the general counsel who had received the call who advised Wiatt that the investigation did not involve her company or Wiatt.

96.     Upon hearing this, Wiatt phoned Starr for his advice. Starr told him that the SEC investigation was probably one of "many" investigations being carried out of "investment advisors" in the wake of the Madoff scandal; that it was just "routine" and that there was "nothing to worry about."

97.     At no time did Starr acknowledge: (i) that he was a target in the investigation; (ii) that he had already been interviewed by the Government on or about March 10, 2010; or (iii) that Bristol was representing him in connection with the SEC investigation.

98.     Starr recommended to Wiatt that he contact Bristol for guidance.

99.     After repeated attempts to reach Bristol by telephone and email, Wiatt emailed Starr stating "He hasn't returned my calls or emails.  Am I in trouble."  Starr responded stating "No – I spoke to jonathan – He knows casey and put a call into him – he said it is absolutely normal – He is probably looking into an investment that was made – no problem for you at all – Jonathan will speak to him tomorrow and take care of it - …"  Starr went on to state that "He just returned from a business trip to Barbados – and I guess he wanted a little time off from business – I called him – he said he would take care of it and it was basically nothing -"

100.    After he finally spoke with him, Bristol echoed the explanation of Starr telling Wiatt that his "understanding" was that this was a routine investigation and that many other investment advisors were being investigated in the wake of the Madoff case.  At that point, Wiatt asked Bristol point blank whether he should be worried about entrusting his finances with Starr and whether he was "another Bernie Madoff."  Bristol stated vehemently that this was not the case and that "there was nothing for [Wiatt] to worry about."

101.    At the conclusion of the conversation, Bristol advised Wiatt that his law firm, Winston & Strawn, was representing the Starr entities in some respects with regard to other matters and that he would need Wiatt to "waive" any potential conflicts that might exist if Bristol represented Wiatt.

102.    Bristol did not disclose to Wiatt: (i) that Bristol had assisted Starr in stealing $2 million from the Wiatts through the use of an attorney trust account; (ii) that Bristol himself and his attorney trust account (and on information and belief, his law firm) were targets or subjects of the investigation; or (iii) that Bristol was already representing Starr in connection with the SEC investigation.

19

103.    Since Wiatt believed that Bristol was acting in his best interests he agreed to waive the conflict and asked Bristol to represent him in discussions with the SEC.

104.    Following his retainer by the Wiatts to represent him in discussions with the SEC, Bristol had a number of telephone conversations and exchanged e-mails with SEC attorneys.

105.    In fact, in a May 18, 2010 email to an SEC attorney, Bristol stated "I've represented Jim Wiatt in connection with various matters.  Jim has asked me (knowing that Winston & Strawn is representing Starr Investment Advisors, Starr & Company, and Kenneth I. Starr in connection with the SEC matter) whether I could participate in the phone conference with Jim and you."

106.    Jim Wiatt exchanged numerous phone calls and emails with Bristol requesting information about the substance of the information requested by the SEC from him.

107.    Bristol went on to arrange a telephone interview scheduled for May 28, 2010 between Jim Wiatt, with Bristol as his counsel, and the SEC to discuss Starr and Bristol's unauthorized wire transfers.

108.    On information and belief, during these conversations with the SEC, Bristol learned additional information concerning the SEC's investigation including the fact that Bristol and, on information and belief, his law firm were involved in the investigation which centered on the illicit transfer of funds from Bristol's attorney trust account which were converted for Starr's personal use.  Despite this fact, Bristol and Winston & Strawn failed to convey this material and critical information to the Wiatts.

109.    Throughout these discussions with the SEC, Bristol continued to advise Jim Wiatt regarding conflicts with his separation agreement in connection with prospective employment opportunities.

110.    Due to the arrest of Starr and the revelations about the Winston & Strawn Defendants' involvement, the May 28, 2010 telephone interview did not occur as scheduled and was ultimately rescheduled with subsequent counsel.

**F.  Starr is Indicted and Sued by the SEC**

111.    On or about May 26, 2010, a criminal complaint by the United States Internal Revenue Service was filed against Starr and another individual in the United States District Court for the Southern District of New York for Starr's fraudulent scheme in connection with the business, accounting, and advisory services he provided his clients, including the Wiatts. *See* Exhibit C.

112.    During the morning of May 27, 2010, federal agents arrested Starr hiding in the bedroom closet of his lavish New York City condominium.

113.    On or about June 10, 2010, an Indictment was returned against Starr. *See* the Starr Indictment (attached hereto as Exhibit D).

114.    In addition, on or about May 27, 2010, the SEC filed a complaint against Starr, Starr & Co., and other entities controlled by Starr, arising from the same fraudulent scheme. *See* the original SEC Complaint (attached hereto as Exhibit E).

115.    Jim Wiatt is described as an unnamed "Client," "Victim," or "Investor" in each of those pleadings.

116.    Bristol is described as an unnamed "attorney" or "associate" of Starr in each of those pleadings.

117.    Both the January Transfer and April Transfer were specifically referenced in the Starr complaints and Indictment, and both formed the basis of counts against Starr and/or his related entities.

118.    Pursuant to the criminal Indictment, Starr faced twenty counts of wire fraud, one count of money laundering, one count of fraud by an investment advisor, and two counts of securities fraud. The January Transfer and April Transfer were the basis of two separate wire fraud counts and formed part of the basis of the money laundering count, and the factual allegations pertaining to these Transfers reference specifically that the transfers were made into (and subsequently out of) an "Attorney Account" (*i.e.*, the Attorney Trust Account).

119.    On or about September 10, 2010, pursuant to an agreement with the United States Attorney, Starr pled guilty to certain counts of the Indictment. As part of this plea agreement, Starr pled guilty to the wire fraud count relating specifically to the January Transfer, and he pled guilty to the money laundering count relating to, *inter alia*, the January Transfer and the April Transfer. *See* Exhibit B.

120.    The United States District Court for the Southern District of New York accepted Starr's guilty plea on October 5, 2010.

121.    As of the date of this filing, Starr has not yet been sentenced. Further, as of the date of this filing, the SEC's action is still pending.

**G.  Winston & Strawn Erases All Evidence that Bristol Was a Partner**

122.    On information and belief, Bristol was terminated by Winston & Strawn. Moreover, when it became public knowledge that Bristol was named in the criminal complaint against Starr as "Associate-4," Winston & Strawn went to enormous, herculean efforts to ensure that Bristol could never be tied to the firm.

123.    Indeed, aside from scrubbing Bristol and any hint of his presence at Winston & Strawn from its website, the firm went back and actually reworked its November 19, 2008 press release announcing that Bristol was joining the firm as partner to entirely remove his name (as

22

well as attending descriptions such as how many new lawyers were joining the firm) from the release.

124.    As it appears from the Indictment, Bristol was not an insignificant partner that Winston & Strawn erased from its website and press release, but, rather, Bristol was hired as a "Capital Partner" at a guaranteed annual compensation of $1.35 million. *See* Exhibit A at ¶ 5.

125.    Although Bristol had been representing the Starr Defendants in connection with the SEC investigation, on June 4, 2010, Winston & Strawn filed a Notice of Withdrawal in the SEC action stating "Pursuant to the Court's request at the June 1, 2010 hearing in this matter, Winston & Strawn LLP hereby confirms that no attorney from Winston & Strawn LLP is representing any party in this case." *See* the Notice of Withdrawal (attached hereto as Exhibit F).

**H. Bristol is Indicted and Sued by the SEC**

126.    On or about December 14, 2010, a Grand Jury charged Bristol with one count of money laundering in connection with his representation of Starr and the Starr entities and use of his attorney trust account to launder over $20 million, which Starr fraudulently obtained from his unsuspecting clients. *See* Exhibit A.

127.    Both the January Transfer and April Transfer are specifically referenced in the criminal Indictment and form a basis for the money laundering count against Bristol. The factual allegations pertaining to these Transfers explain that the transfers were made into (and subsequently out of) Bristol's "Escrow Account" (*i.e.*, the Attorney Trust Account). *See* Exhibit A.

128.    On December 16, 2010, the SEC amended its complaint against Starr to allege claims against Bristol for aiding and abetting Starr's securities violations. *See* the SEC's Amended Complaint (attached hereto as Exhibit G).

129.    Jim Wiatt is described as an unnamed "Client," "Victim," or "Investor" in each of these pleadings.

130.    Also on December 16, 2010, the Indictment against Bristol was unsealed and Bristol surrendered to law enforcement.

## CAUSES OF ACTION

### COUNT I
### (Negligent Misrepresentation)
### (Against All Defendants)

131.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein, except those allegations that state that any of Defendants acted in a fraudulent manner.

132.    This cause of action does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

133.    In making the misrepresentations and omissions alleged herein, Defendants acted without any reasonable grounds for believing the representations they made to be true.  Had Defendants employed due care, Defendants would have discovered and known of their misstatements and omissions.

134.    The misrepresentations made by Defendants as described herein were made directly and/or indirectly to Plaintiffs in the course of their representation of Plaintiffs as their accountants, financial advisers, and attorneys.

135.    Defendants owed Plaintiffs duties of reasonable care and knew, or should have known, that Plaintiffs would rely upon each of Defendants' acts, practices, misrepresentations, omissions and violations and other wrongs complained of above.

136.    Plaintiffs actually, reasonably, foreseeably and justifiably relied upon each of the acts, practices, misrepresentations, omissions, violations and other wrongs complained of above,

in, among other things, permitting Defendants to remain in fiduciary relationships with them and continuing to maintain their accounts, which allowed them to continue diverting Plaintiffs' funds for their own private purposes.

137.    As a direct and proximate result of the conduct of each of Defendants, as described herein, Plaintiffs were induced to acquiesce in permitting Defendants to maintain Plaintiffs' accounts and remain in fiduciary relationships, and have sustained damages in an amount to be determined at trial.

## COUNT II
### (Breach of Fiduciary Duty)
### (Against Winston & Strawn Defendants)

138.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

139.    By virtue of the foregoing, the Winston & Strawn Defendants have breached their fiduciary duties to Plaintiffs.

140.    Through their positions as Plaintiffs' entrusted attorneys, and because of their ability to control Plaintiffs' money in their attorney trust account, Defendants owed Plaintiffs fiduciary obligations of trust, loyalty, good faith and due care, and were required to use their utmost ability to manage Plaintiffs' money and communicate any conflicts or malfeasance in a fair, just, honest and equitable manner.

141.    As fiduciaries, to discharge these duties, Defendants were and are required to exercise prudent supervision over their attorney-client relationship with Plaintiffs.

142.    Defendants had a duty and ample opportunity to discuss material information with Plaintiffs.

143.    The Winston & Strawn Defendants have further failed to give Jim Wiatt any explanation of what happened to Plaintiffs' funds that were diverted to their attorney trust account.

144.    Defendants' conduct, as set forth herein, constitute conscious misbehavior and recklessness.  Each of Defendants was and is responsible for the attorney-client relationship as a whole.

145.    Defendants breached, and continue to breach, their fiduciary duties, causing damage to Plaintiffs.

146.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT III
### (Negligent Supervision)
### (Against Winston & Strawn)

147.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

148.    On or about October 2009, Plaintiffs entered into an attorney-client relationship with Bristol, a Capital Partner at Winston & Strawn, in New York, New York, who is an attorney admitted to practice law in New York and New Jersey.

149.    At all relevant times, Winston & Strawn, employed Bristol as an attorney and partner and had a duty and the ability to supervise and control its attorneys.

150.    The Winston & Strawn Defendants had a duty to exercise reasonable care in supervising the representation of their clients and over the conduct and performance of their attorneys' duties, including ensuring that their attorneys' conduct is not below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession.

151.    Winston & Strawn knew or should have known of the necessity and opportunity for exercising such control of their attorneys.

152.    Winston & Strawn negligently and carelessly failed to maintain such control.

153.    Specifically, Winston & Strawn negligently and carelessly failed to supervise one of its partners so as to permit Bristol to represent clients, *i.e.* the Wiatts and the Starr Defendants, with conflicting interests, to participate in a conspiracy to divert funds belonging to a firm client for the benefit of another client, to mislead the Wiatts about the true nature of the wire transfers, to mislead the Wiatts about the SEC investigation, and to misrepresent to the SEC that Plaintiffs knowingly waived any conflict of interest in Winston & Strawn's representation of them and the Starr Defendants, who were targets in the SEC investigation.

154.    As a direct and proximate result of the negligence of Winston & Strawn, as aforesaid, Plaintiffs were caused to be injured due to the diversion of their funds through an attorney trust account and other ethics violations, and were thus caused to sustain and did sustain significant injuries.

## COUNT IV
### (Legal Malpractice)
### (Against Winston & Strawn Defendants)

155.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

156.    The Winston & Strawn Defendants agreed to represent Plaintiff Jim Wiatt and had an attorney-client relationship with him.  The Winston & Strawn Defendants therefore had a duty to exercise reasonable care in their representation of Jim Wiatt.

157.    The Winston & Strawn Defendants represented clients, *i.e.* Plaintiffs and the Starr Defendants, with conflicting interests, participated in a conspiracy to divert, misappropriate, or misapply funds belonging to a firm client for the benefit of another client, failed to safeguard funds belonging to a client, misled the Wiatts about the true nature of the wire transfers, misled the Wiatts about the SEC investigation, and misrepresented to the SEC that Plaintiffs knowingly waived any conflict of interest in Winston & Strawn's representation of them and the Starr Defendants, who were targets in the SEC investigation, in violation of the New Jersey Rules of Professional Conduct 1.1, 1.3, 1.4, 1.7, 1.15, and 8.4.

158.    The Winston & Strawn Defendants have failed to give the Wiatts any explanation of what happened to Plaintiffs' funds that were diverted to their attorney trust account and misappropriated by Bristol and/or Starr.

159.    The Winston & Strawn Defendants' conduct and performance of their duties, including and without limitation as alleged above, was conduct below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession.

160.    As a direct and proximate result of the Winston & Strawn Defendants' legal malpractice, as aforesaid, the Wiatts were caused to be injured due to the diversion of their funds

through an attorney trust account and other ethics violations and were thus caused to sustain and did sustain significant injuries.

## COUNT V
### (Unjust Enrichment)
### (Against All Defendants)

161.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

162.    There was a confidential and fiduciary relationship between Plaintiffs and Defendants.

163.    Defendants had no legal or equitable rights to Plaintiffs' funds at City National Bank.

164.    Defendants misappropriated at least $2,000,000 of Plaintiffs' funds for their own purposes and to the detriment of Plaintiffs.

165.    Defendants, through their unethical and unlawful conduct, as set forth above, caused Plaintiffs to lose at least $2,000,000 that was transferred to an attorney trust account and has never been returned.

166.    As a result of their unethical and unlawful conduct, fraud, conspiracy, breach of fiduciary duty and interference with contract, Defendants have been unjustly enriched by economic benefits to which they are not entitled, and which would be inequitable and unconscionable for them to continue to retain, all to Plaintiffs' detriment.

## COUNT VI
### (Conversion)
### (Against All Defendants)

167.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

168.    There was a confidential and fiduciary relationship between Plaintiffs and Defendants.

29

169.    Defendants had no legal or equitable rights to Plaintiffs' funds at City National Bank.

170.    Defendants misappropriated at least $2,000,000 of Plaintiffs' funds that were in Plaintiffs' account at City National Bank for Defendants' own improper purposes and to the detriment of Plaintiffs.

171.    Defendants, through their unethical and unlawful conduct, as set forth above, caused Plaintiffs to lose at least $2,000,000 that was transferred to Bristol's attorney trust account and has never been returned.

172.    By virtue of the foregoing, the Defendants have exercised an act of unauthorized dominion over Plaintiffs' monies in denial of Plaintiffs' clear, uncontroverted, and unequivocal right to such monies – that is to say, converted Plaintiffs' $2,000,000, thereby greatly damaging and injuring Plaintiffs.

173.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have suffered damages in an amount that has yet to be ascertained.

## COUNT VII
### (Civil Conspiracy)
### (Against All Defendants)

174.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

175.    In committing the wrongful acts alleged above, Defendants have pursued a common course of conduct, acted in concert with and have conspired, and agreed with one another in furtherance of their common plan, scheme and design to injure Plaintiffs, and have taken at least one act in furtherance thereof.

176.   In furtherance of their plan, conspiracy and course of conduct, Defendants took the actions set forth herein, all of which constitute overt acts resulting in damage to Plaintiffs.

177.   As a direct and proximate result of Defendants' acts of conspiracy, as described herein, Plaintiffs were materially damaged and have sustained damages in an amount to be determined at trial.

178.   Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

**COUNT VIII**
**(Fraud)**
**(Against All Defendants)**

179.   Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

180.   By the illegal and fraudulent acts and schemes described above, Defendants willfully and intentionally defrauded Plaintiffs and made or caused to be made false, fraudulent and material misrepresentations and omissions to Plaintiffs concerning wire transfers and investments.

181.   The January and April Wire Transfers were fraudulently obtained from Plaintiffs without their approval or knowledge.  In addition, these wire transfers were intentionally disguised as investments made on Plaintiffs' behalf.

182.    Each Defendant purposely concealed the true nature of the wire transfers and made them appear to be investments with the intent and purpose that Plaintiffs would rely on the same.  In making and carrying out these material misrepresentations, Defendants, and each of them, intended to and did deceive Plaintiffs.

183.    Plaintiffs believed and relied upon these material misrepresentations and omissions.

184.    As a direct and proximate result of Defendants' material misrepresentations and omissions Plaintiffs suffered substantial damages.

185.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT IX
### (Conspiracy to Defraud)
### (Against All Defendants)

186.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

187.    Through a series of activities outlined above in Count VIII, Defendants entered into an agreement with a common design to defraud Plaintiffs.

188.    Each of Defendants willfully and knowingly agreed and conspired with other Defendants to commit the above referenced acts of fraud, including wire fraud and money laundering, for an unlawful purpose.

32

189.   Defendants are each equally and vicariously liable to Plaintiffs for their damages.

190.   By reason of the aforesaid conspiracy, Plaintiffs have suffered the following damages that were proximately caused by the overt acts of one or more Defendants in furtherance of the conspiracy:

(a)   the loss of moneys transferred from their account that have not been returned;

(b)   injury to Plaintiffs' business reputations;

(c)   the loss of at least one business opportunity and profits; and

(d)   other consequential, incidental and special damages.

191.   In addition, Defendants acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT X
### (Violation of 18 U.S.C. § 1962(c) (RICO))
### (Against All Defendants)

192.   Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

193.   18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

194.   All Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

33

195.    In violation of the above-mentioned statute, Defendants associated with the Starr

Enterprise, which was an association in fact consisting of Defendants together and with other

persons not known to Plaintiffs.

196.    The Starr Enterprise engaged in, and conducted activities which affected,

interstate commerce.

197.    Each Defendant conducted and participated in the conduct of the affairs of the

Starr Enterprise and played a role in the management and operation of the enterprise through a

pattern of racketeering activities, which included, but was not limited to, wire fraud, money

laundering, and investment adviser fraud.

198.    This pattern of racketeering included the following illegal acts defined as at least

two predicate acts of RICO liability under 18 U.S.C. § 1961 within a ten (10) year period,

including, but not limited to the following, which formed the basis for Kenneth Starr's October

5, 2010 plea:

(a)    Wire fraud, as defined by 18 U.S.C. § 1343, in that for the purposes of

executing Defendants' scheme and artifice to defraud, and to obtain money by means of false

and fraudulent pretenses, representations, and promises, Defendants did transmit and cause to be

transmitted by means of wire in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, specifically, the Starr

Defendants controlled millions of dollars belonging to Plaintiffs and in each instance where the

Starr Defendants executed a wire transfer in New York in January 2010 and April 2010 that

transferred a total of $2,000,000 of Plaintiffs' funds to Defendant Bristol's Attorney Trust

Account in New Jersey, Defendants misappropriated Plaintiffs' funds, all while failing to

disclose the existence of these wire transfers and, when questioned, making material misrepresentations about the true purposes of the wire transfers; and

(b)      Money laundering, as defined by 18 U.S.C. § 1956(a)(1), in that Defendants unlawfully and willfully, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct financial transactions which in fact involved the proceeds of specified unlawful activity, specifically, Defendants received proceeds from the January 2010 and April 2010 wire transfers to Defendant Bristol's Attorney Trust Account in New Jersey, with the intent to promote the carrying on of specified unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity in misappropriating Plaintiffs' funds and writing them to the trust account before diverting them to their ultimate destination to make it appear as if the funds were being directed to lawful and appropriate investments and were being received from a lawful and appropriate source.

199.    The foregoing predicate acts of racketeering activity conducted by Defendants through the Starr Enterprise caused Plaintiffs to lose money and business opportunities. The members of the Starr Enterprise were illicitly enriched through the receipt of funds transferred from Plaintiffs' account.

200.    By reason of the foregoing violations of 18 U.S.C. § 1962(c) Plaintiffs have suffered the following foreseeable losses and damages:

(a)      the loss of moneys transferred from their account that has not been returned;

(b)      injury to Plaintiffs' business reputations;

(c)      loss of at least one business opportunity and profits; and

(d)     other consequential, incidental and special damages.

201.    In addition, Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT XI
## (Violation of 18 U.S.C. § 1962(d) (RICO))
## (Against All Defendants)

202.    Plaintiffs incorporate by reference all paragraphs above, other than the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

203.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection. . . (c) of this section."  Through a series of activities outlined above in Count VIII,  Defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above.

204.    Each Defendant willfully and knowingly agreed and conspired with other Defendants to commit the above referenced predicate acts of wire fraud and money laundering.

205.    By reason of the aforesaid violations of 18 U.S.C. § 1962(d) Plaintiffs have suffered the following foreseeable losses and damages:

(a)     the loss of moneys transferred from their account that has not been returned;

(b)     injury to Plaintiffs' business reputations;

(c)     loss of  at least one business opportunity and profits; and

(d)     other consequential, incidental and special damages.

206.    In addition, Defendants acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.  As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT XII
### (Tortious Interference with Contract)
### (Against All Defendants)

207.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

208.    Plaintiffs had an agreement with an investment advisor at UBS for an investment of $2,000,000.

209.    Defendants knew that Plaintiffs intended to make this particular investment with UBS and had in fact provided Plaintiffs a letter to sign dated April 26, 2010 that authorized the payment.

210.    Defendants tortiously interfered with Plaintiffs' written request for an investment of $2,000,000 dated April 26, 2010 to be paid as instructed to a particular investment advisor at UBS.

211.    Defendants intentionally interfered with that contractual relationship by failing to make the payment and instead wiring $1,000,000 to Bristol's Attorney Trust Account for Bristol to reimburse another Starr client from whom Starr and Bristol had diverted funds.

212.    As a result of Defendants' actions, the $1,000,000 was never invested with UBS.

213.    Plaintiffs have suffered damages from the loss of this contract and future revenue.

214.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.  As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT XIII
### (Tortious Interference with Prospective Business Advantage/Relations)
### (Against All Defendants)

215.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count I, Count III and Count IV, as if fully set forth herein.

216.    Defendants tortiously interfered with Plaintiffs' existing and prospective business relationships with an investment advisor/manager by virtue of their failure to comply with a written request for an investment of $2,000,000 dated April 26, 2010 to be paid as instructed to an individual at UBS.

217.    Defendants intentionally interfered with that prospective business relationship by failing to make the payment and instead wiring $1,000,000 to Bristol's Attorney Trust Account for Bristol to reimburse another Starr client from whom Starr and Bristol had diverted funds.

218.    But for Defendants' actions, the other $1,000,000 would have been invested with UBS.

219.    Plaintiffs have suffered damages from the loss of this business relationship and its future revenue.

220.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic

harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein,
Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because
Defendants should be punished for their egregious misconduct and to deter them and others in
their positions from acting the same way in the future.

## COUNT XIV
### (Accounting)
### (Against All Defendants)

221.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

222.    A fiduciary relationship exists between Plaintiffs and Defendants.

223.    Defendants had access to Plaintiffs' accounts from which Defendants took
$2,000,000.

224.    By virtue of the foregoing, each Defendant must be compelled to provide an
accounting of their personal accounts, business accounts, and trust accounts to discover the
whereabouts of Plaintiffs' funds.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully request that the Court:

(a)     Order that the Starr Defendants account to Plaintiffs for all fees, profits or
financial or non-financial benefits arising from or in any way received in
connection with the foregoing wrongful and unlawful acts of Defendants
and that, in accordance with such accounting, Plaintiffs be awarded
judgment for such fees, profits or benefits;

(b)     Order that Defendants pay Plaintiffs any and all damages sustained by
Plaintiffs arising from the foregoing wrongful and unlawful acts of
Defendants;

(c)     Order that Defendants promptly deliver to Plaintiffs a complete accounting
of all transactions involving each of Plaintiffs from the commencement of
Defendants' employment on behalf of Plaintiffs;

(d)     Order that all Defendants be required to return all professional fees, from at
least 2009 to the present, received by them while they were in material
breach of their fiduciary duties set forth above;

39

(e)  Order that Defendants promptly turn over to Plaintiffs copies of all personal books, records, documents and tax returns belonging to Plaintiffs that have not yet been turned over to Plaintiffs;

(f)  Order that Plaintiffs be awarded their costs and reasonable attorneys' fees incurred in connection with the institution and prosecution of this civil action;

(g)  Award Plaintiffs punitive damages as to Counts II, VII, VIII, IX, X, XI, XII, and XIII in an amount to be determined at trial; and

(h)  Order such other and further relief as justice may require.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: December 20, 2010

David S. Stone
Robert A. Magnanini
Amy Walker Wagner
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, NJ 07078
Tel: (973) 218-1111
Fax: (973) 218-1106

*Attorneys for Plaintiffs James A. Wiatt
and Elizabeth Rieger Wiatt*