David S. Stone
Robert A. Magnanini
Amy W. Wagner
Jason C. Spiro
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ 07078
Tel: (973) 218-1111
Fax: (973) 218-1106
*Attorneys for Plaintiffs James A. Wiatt*
*and Elizabeth Rieger Wiatt*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES A. WIATT and ELIZABETH RIEGER WIATT,<br><br>                     Plaintiffs,<br><br>      v.<br><br>WINSTON & STRAWN LLP, JONATHAN S. BRISTOL, STARR & COMPANY, LLC, STARR INVESTMENT ADVISORS, LLC, AURORA CASSIRER, ESQ., AS RECEIVER FOR STARR & COMPANY, LLC and STARR INVESTMENT ADVISORS, LLC, KENNETH I. STARR, ARLENE M. GRAFF, and DOES 1-10,<br><br>                    Defendants. | **Civil Action No. No. 10-6608 (JLL) (MAH)**<br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiffs James A. Wiatt ("Jim Wiatt") and Elizabeth Rieger Wiatt ("Elizabeth Wiatt")

(collectively the "Wiatts" or "Plaintiffs"), by and through their attorneys Stone & Magnanini

LLP, make the following factual allegations applicable to each cause of action pled herein:

## INTRODUCTION

1.      This is an action by the Wiatts seeking compensation and other relief for the naked theft of their money by Defendants Kenneth Starr ("Starr"), Arlene M. Graff ("Graff"), Starr & Company, LLC and Starr Investment Advisors, LLC (collectively "Starr Defendants"), Jonathan Bristol ("Bristol"), and Winston & Strawn LLP ("Winston & Strawn"), and Does 1-10 (collectively the "Defendants"), and Aurora Cassirer, Esq., Receiver to Starr & Company, LLC and Starr Investment Advisors, LLC ("Receiver").

2.      Starr is a former financial advisor and investment manager who has recently pled guilty to numerous felonies relating to the theft of tens of millions of dollars from his celebrity clients.  Through Starr's management of the Wiatts' investments and business accounts, he provided them with financial advice and cultivated a close relationship of trust with the Wiatts.

3.      At all relevant times, Bristol was a Capital Partner of Winston & Strawn, a multi-national law firm with offices in New Jersey, New York and throughout the globe. Starr and the various Starr entities were key clients of Bristol and Winston & Strawn.  Bristol and Winston & Strawn represented Starr in connection with general corporate matters, an SEC investigation into Starr's improper investment practices, and a dispute with one of Starr's former clients concerning Starr's improper investment practices.

4.      Facing pressure from Winston & Strawn to increase his billable revenue, starting in or about July 2009, Bristol agreed to permit Starr -- one of his key clients -- to use his attorney trust account at TD Bank, in Chatham, NJ (the "Attorney Trust Account"), to receive unauthorized transfers of Starr's clients' investment funds, and to transfer those funds at Starr's direction for Starr's use, including in connection with Winston & Strawn's legal representation of Starr.

2

5.      In or about October 2009, Starr referred the Wiatts to Bristol for legal assistance in connection with various business and investment matters.  The Wiatts entered into a general attorney-client relationship with Bristol, in his capacity as a Capital Partner of Winston & Strawn, and they confirmed that representation orally and in writing on October 29, 2009.  The Wiatts and Bristol maintained a continuous and wide-ranging attorney-client relationship in connection with their business and investment activities through May 2010.  During that time, the Wiatts relied upon Bristol's advice and trustworthiness and the reputation and integrity of Winston & Strawn.

6.      Eager for the Wiatts' business and a high profile source of referrals, Bristol never disclosed to the Wiatts obvious conflicts of interest posed by Bristol's and Winston & Strawn's representation of Starr and his companies, including matters involving allegations of Starr's improper investment activities.  Bristol also failed to disclose his use of his Attorney Trust Account to receive unauthorized transfers of client investment funds for Starr's business and personal use.  Instead, Bristol expressly and implicitly represented to the Wiatts that he was conflict free and engaged in protecting the Wiatts' business and investment interests.

7.      In fact, while Bristol and Winston & Strawn simultaneously represented the Wiatts and the Starr Defendants, they violated numerous, fundamental duties of care to the Wiatts and committed bare theft from the Wiatts' joint checking account at City National Bank in Beverly Hills, California (the "Managed Account").

8.      On January 4, 2010, pursuant to Bristol's agreement with Starr, Bristol facilitated the Starr Defendants' unauthorized transfer of $1 million of the Wiatts' funds into his Attorney Trust Account (the "January Transfer"), for the benefit of the Starr Defendants, Bristol and Winston & Strawn.  Knowing that these funds belonged to the Wiatts, Bristol combined their

3

money with $3 million misappropriated from other Starr clients, and he transferred $4 million to a disgruntled Starr client in settlement of a dispute being handled by Winston & Strawn.

9.  During January through March 2010, Bristol continued to provide the Wiatts with legal advice in connection with their business and investment activities, at all times hiding Starr's theft from the Wiatts, as well as Starr's ongoing theft from other Starr clients.  When, in or about March 10, 2010, Jim Wiatt received a copy of his investment account statement from Starr and questioned the January Transfer, Starr falsely told Wiatt that Bristol was bundling Wiatts' money with other investor funds to make an investment with UBS.  Both the Starr Defendants and Bristol adopted this UBS cover story, and falsely repeated it to the Wiatts over the next two months in order to hide Starr's theft.  When in mid-March 2010, the Wiatts asked Bristol to help them retrieve a separate Starr investment, he agreed to help them and to identify other problem Starr investments, although he still did not disclose the nature of the January Transfer.

10.  During January through March 2010, while misleading the Wiatts about the January Transfer, Bristol continued to permit Starr to make unauthorized transfers of client funds into his Attorney Trust Account, and he used those funds to pay Starr's operating expenses and Winston & Strawn's legal bills (by providing Winston & Strawn with two $100,000 checks payable to Winston & Strawn from Bristol's Attorney Trust Account).

11.  In or about mid-April 2010, actress Uma Thurman discovered that Starr made an unauthorized transfer of $1 million into the account of someone named "Bristol."  On or about April 23, 2010, attorneys from Paul, Weiss, Rifkind & Garrison called Bristol at Winston & Strawn's New York offices and discovered that he was, in fact, the "Bristol" referred to on

4

Starr's ledger and he had permitted Starr to use his Attorney Trust Account to make the unauthorized $1 million transfer of funds belonging to Uma Thurman.

12.     In order to quickly cover up this issue and conceal their illegal activity, Starr asked the Wiatts for authorization to transfer $2 million to UBS, again under the pretense of making an investment.  Once the Starr Defendants received that authorization, on April 26, 2010, instead of making the authorized $2 million transfer, they transferred $1 million of the Wiatts' funds to Bristol (the "April Transfer"), and Bristol transferred $1 million of the Wiatts' funds to Uma Thurman.  As explained in more detail below, after carrying out this intentional deception, Starr and Bristol went to extraordinary lengths to hide the January and April Transfers from the Wiatts until Starr's eventual arrest on May 27, 2010.

13.     If the Wiatts had learned of the true nature of the January and April Transfers at any time prior to May 27, 2010, when the Federal Government arrested Starr hiding in his bedroom closet, they would have immediately put a stop to the transfers and/or demanded and received the return of their money from Starr and Bristol, as did other Starr investors.  Indeed, as late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account and on that date he returned money directly to certain Starr investors.

14.     Based on the guilty pleas in Starr's and Bristol's criminal matters, there is no longer any question that Starr and Bristol knowingly conspired to use, and did use, Bristol's Attorney Trust Account to steal and launder the Wiatts' money.  Starr pled guilty to stealing millions of dollars from his clients, including specifically $2 million from the Wiatts in the January and April Transfers, and shortly after the Wiatts filed this suit Bristol pled guilty to conspiring with Starr to steal and launder those funds.

5

15.     There is also no question that Winston & Strawn is responsible and should be held accountable for Bristol's conduct.  On May 2, 2011, when U.S. Attorney Preet Bharara announced Bristol's guilty plea, he stated that Bristol had used his position of trust, as a Capital Partner of Winston & Strawn, to enable and conceal Starr's criminal activity, stating:

> Attorneys are supposed to promote respect for the rule of law.  But Jonathan Bristol abused his position as a partner at a prominent New York City law firm to break the law over and over again.  Bristol should have been a gatekeeper; instead, he was an enabler of Kenneth Starr and his multi-million dollar fraud.

16.     In fact, during the entirety of Bristol's conspiracy with Starr, Bristol was a Capital Partner of Winston & Strawn (*i.e.*, entitled to an equity stake in the firm's profits), who used his position at Winston & Strawn to commit crimes against the Wiatts under the guise of providing them with legal representation, and used his Attorney Trust Account to funnel stolen client investment funds to Starr for the purpose of  (i) settling a client matter being handled by Winston & Strawn and (ii) paying Starr's debts to Winston & Strawn.  Indeed, in pursuing this scheme, Bristol acted at all times with the apparent authority of Winston & Strawn, including in his communications with the Wiatts, the Wiatts' business associates, attorneys for the Securities and Exchange Commission ("SEC"), and attorneys for Neil Simon and Uma Thurman.

17.     It may seem surprising that Winston & Strawn sat idly by while one of its Capital Partners used his Attorney Trust Account to help steal and launder nearly $20 million for the personal use of a firm client -- $2 million of which belonged to the Wiatts, another firm client -- over a period of ten months, but it is nothing less than stunning that Winston & Strawn now asserts that it has no responsibility for its Capital Partner's actions under these circumstances.

18.     The Wiatts bring this action to hold Bristol, Winston & Strawn and the Starr Defendants accountable for abusing their positions of trust and misappropriating the Wiatts' funds for their own personal benefit.

## THE PARTIES

19.     Plaintiff Jim Wiatt is, and at all relevant times was, a resident of Pacific Palisades, California.

20.     Plaintiff Elizabeth Wiatt is, and at all relevant times was, a resident of Pacific Palisades, California.

21.     Defendant Starr & Co. (formerly known as Starr & Company Financial Consultants, LLC) is a New York limited liability company, with its principal office in New York, New York.   Starr & Co. held itself out to Plaintiffs as a firm of accountants, CPAs, business managers, investment managers, investment advisors, financial planner/consultants, and attorneys that provided bookkeeping, accounting, auditing, investment management, investment advisory, financial (including tax) planning/consulting, tax preparation, business management, and legal services.

22.     Defendant Starr Investment Advisors, LLC ("SIA") is a Delaware limited liability company with its principal office in New York, New York.  SIA is registered with the SEC as an Investment Advisor and represents to the SEC that it provides financial planning services, portfolio management for individuals, and the selection of other advisers to its clients.  SIA is a wholly-owned subsidiary of Starr & Co.

23.     Defendant Aurora Cassirer, Esq. is the Receiver for Starr & Company, LLC, Starr Investment Advisors, LLC and other parties in the action styled *SEC v. Kenneth Ira Starr, et al.* Docket No. 10-cv-4270-SHS in the United States District Court for the Southern District of New

York.  The Receiver was appointed by the Southern District of New York pursuant to the Court's Orders dated June 7, 2010 and July 8, 2010.  Plaintiffs believe that the Receiver may be served with process by and through her attorney, Lee W. Stremba, Esq. of Troutman Sanders LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174.

24.     Defendant Starr is a resident of the State of New York.  At all relevant times, Starr was a certified public accountant licensed by the State of New York and an attorney admitted to practice law before the New York State Bar.  At all relevant times, Starr held himself out to Plaintiffs as an accountant, CPA, business manager, investment manager, investment advisor, financial consultant, and attorney.  On information and belief, at all relevant times, Starr was the 100% owner (through both direct and indirect interests), sole member, President, and CEO of Defendant Starr & Co.

25.      Defendant Graff is a resident of the State of New Jersey and at all relevant times was a principal of Starr & Co.  At all relevant times, Graff held herself out to Plaintiffs as an accountant, CPA, business manager, investment manager, investment advisor, and financial consultant.

26.     Defendants Does 1-10 are parties whose true names and capacities are currently unknown.  On information and belief, Does 1-10 are in some manner responsible for the injuries sustained by Plaintiffs and/or are Starr & Co.'s predecessors-in-interest, successors-in-interest, partners, agents, principals, employees, employers, parent corporations, subsidiary corporations, members, instrumentalities, alter egos, conduits, joint ventures, co-conspirators, aiders and abettors, or connected with, and/or legally responsible for, the actions of Starr & Co. and Ken Starr.  On information and belief, Does 1-10 may include Starr & Company, PC, Starr & Company, LLP, Kisco CPA, PC f/k/a Starr & Company CPA, PC, and/or Kisco Holdings, Inc.

27.     Defendants Starr & Co., SIA, and Does 1-10, are collectively referred to as the "Starr Entities." The Starr Entities, together with Starr and Graff, are collectively referred to as the "Starr Defendants."

28.     Defendant Winston & Strawn is an Illinois limited liability partnership engaged in the practice of law at various locations in the United States and Europe. At all relevant times, Winston & Strawn has had offices in Newark, New Jersey and New York, New York.

29.     According to publicly available information, including the Appellate Court of Illinois' decision in *Winston & Strawn v Nosal*, 664 N.E.2d 239 (Ill. App. Ct. 1996), Winston & Strawn has a two-tiered partnership structure consisting of capital partners, who are compensated based upon a percentage of the firm's profits, and non-capital "income" partners who are salaried.

30.     Defendant Bristol is, and at all relevant times was, a resident of Chatham, New Jersey. At all relevant times, he was an attorney licensed to practice law before the New Jersey and New York State Bars. At all relevant times, Bristol was a "Capital Partner" at Winston & Strawn who generated business and performed services for clients in his capacity as a Capital Partner of Winston & Strawn in both New Jersey and New York. The work performed by Winston & Strawn attorneys on behalf of Plaintiffs was performed in New Jersey and New York.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000, exclusive of interest and costs, and federal question jurisdiction under 18 U.S.C. § 1964(c).

32.     Venue of the following claims is laid in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims herein occurred in the District of New Jersey.

## FACTUAL ALLEGATIONS

### A. The Wiatts' Fiduciary Relationship with the Starr Defendants

33.     Jim Wiatt is a former executive of a talent agency and is now a consultant for a leading global web services company.  Elizabeth Wiatt is a businesswoman and entrepreneur.

34.     In 2003, Starr, a non-practicing attorney and financial adviser, was in the business of managing famous, high net worth clients' money, particularly clients in the entertainment industry.

35.     From August 2003 until late May 2010, the Wiatts engaged Starr and the Starr Defendants to manage all aspects of their personal finances.  This included accounting, business management, investment management, investment advice, financial consulting, financial planning, and tax advice.  The Starr Defendants were also involved in assisting the Wiatts with the selection and utilization of other professionals, such as bankers, realtors, and lawyers.  The Wiatts placed their trust in Starr and gave him access to and control of the majority of their financial assets.

36.     For the performance of these services, the Wiatts paid the Starr Defendants substantial professional service fees on a monthly basis.

37.     During Starr's representation of the Wiatts, officials of the Starr Entities, including but not limited to Starr and Graff, had signatory authority over the Wiatts' bank and/or investment accounts as well as trusts and corporate entities which the Wiatts' controlled.

38.     For instance, from at least in or around August 2003 through on or about May 27, 2010, Starr and Graff each had signatory authority and power of attorney over the Wiatts' Managed Account.  Moreover, at all relevant times, monthly account statements for the Managed Account were sent to Starr & Co.'s offices and not to the Wiatts.

39.     Indeed, Jim Wiatt's paychecks and all of the Wiatts' bills were sent to the Starr Defendants, including Starr and Graff, who paid the Wiatts' personal bills out of the Managed Account and disbursed all checks.

40.     On a monthly basis, and usually at the end of the following month, the Starr Defendants provided the Wiatts with a financial report that provided details for each of the Wiatts' accounts, such as account balance sheets, portfolio allocations, investment allocations, investment performance, stock options, income and expenses, receipts and disbursements, major expense analysis, and a description of investments.

41.     Moreover, since 2003, Starr fostered a close personal friendship with Jim Wiatt. This friendship grew, prospered, and suddenly evaporated on the day of Starr's arrest, the day after Starr and Wiatt met for drinks with some mutual friends.  In fact, on the morning of Starr's arrest, Wiatt sent Starr an email stating in part "Sorry I didn't get to the office.  Will next trip. Appreciate your friendship and advice."

42.     As set forth more fully herein, Starr took advantage of and betrayed the Wiatts' relationship of trust by conspiring with the Wiatts' attorney at Winston & Strawn, Jonathan Bristol, to steal and launder $2 million from the Wiatts' Managed Account.

### B.  Bristol's Relationship with Starr

43.     Starting in or about 2007, the Starr Defendants formed an attorney-client relationship with Bristol, who was, at the time, a real estate and corporate transactions partner at Thelen LLP out of its Florham Park, New Jersey office.

44.     In or about November 2008, Bristol accepted an offer to become a Capital Partner of Winston & Strawn.  As a Capital Partner of Winston & Strawn, Bristol had an equity stake in the firm and presumably voting rights in the firm's management.

45.     Winston & Strawn agreed to pay Bristol, on top of any signing bonus, guaranteed annual compensation of at least $1.35 million for each of the fiscal years ending January 31, 2009, 2010 and 2011, in addition to potential incentive compensation based upon Bristol's performance.  Winston & Strawn expected that Bristol would generate sufficient business and revenue for the firm to justify his substantial compensation.

46.     When Winston & Strawn announced Bristol's addition to the firm, an article was published boasting that Bristol was bringing his valuable and famous Starr clients with him to Winston & Strawn.

47.     Bristol's legal practice was much less lucrative than Winston & Strawn expected, and, as a result, Bristol faced pressure from Winston & Strawn to build his book of business and increase his billable revenue.  Bristol knew that if he was unsuccessful, he faced the prospect of losing his guaranteed compensation.

48.     Throughout Bristol's time at Winston & Strawn, Starr was one of his biggest clients.  Bristol represented Starr on general corporate matters, as well as in connection with Starr's multimillion dollar dispute with Neil Simon concerning Simon's claim that Starr had improperly invested his money.

49.     In or about July 2009, Winston & Strawn was pressuring Bristol to increase his billable business by threatening to reduce his guaranteed compensation.  At the same time, Bristol agreed to use his Attorney Trust Account to receive transfers of Starr's client funds, which Bristol knew were not authorized by Starr's clients, and to transfer those funds at Starr's direction for Starr's personal use.  Bristol agreed to take part in Starr's scheme, at least in part, because Starr was helping Bristol build his business at Winston & Strawn.

50.     Also in July 2009, Bristol obtained new business from Starr that was important to his compensation at Winston & Strawn.  Starr retained Bristol and Winston & Strawn to represent Starr and the Starr Defendants in connection with an SEC investigation into Starr's investment practices.

51.     Bristol and Winston & Strawn performed substantial work on behalf of the Starr Defendants, particularly in connection with the SEC matter, which over the ensuing months generated over $1 million in legal fees for Winston & Strawn.

**C. The Wiatts' Attorney-Client Relationship with Bristol and Winston & Strawn**

52.     When, in October 2009, Jim Wiatt sought legal advice in connection with his business and investment activities, Starr referred Wiatt to Bristol, whom he described as a good friend and a successful partner at Winston & Strawn.  Bristol was also fully aware of Starr's relationship with and fiduciary duties to the Wiatts through his professional and personal relationship with Starr.

53.     Starr did not disclose to the Wiatts that Bristol and Winston & Strawn represented Starr in connection with a client dispute and an SEC investigation into Starr's alleged improper investment practices.  Bristol also failed to disclose to the Wiatts that he was using his Attorney

Trust Account to receive unauthorized transfers of Starr's client investment funds and transferring those funds at Starr's direction for Starr's personal use.

54.     On or about October 29, 2009, relying upon Starr's recommendation, Bristol's credentials, and the reputation of Winston & Strawn, Jim Wiatt engaged Bristol and Winston & Strawn to provide him with general legal representation in connection with his business and investment interests, including specifically his service on the board of directors for public and private companies.  Wiatt and Bristol confirmed the engagement by phone and email to Bristol at his Winston & Strawn office and on his Winston & Strawn email account.  Wiatt told Bristol to send him a formal retention agreement, and Bristol said he would put one together, but "not to worry about it" because Wiatt was a friend of Starr and Bristol would represent him in the meantime.  Bristol told Wiatt that he was honored to represent him and hoped that it would lead to other business opportunities.

55.     Contrary to placing any limitations on Winston & Strawn's representation, Bristol actively sought to expand it.  Because Bristol was facing significant pressure to increase his billable revenue for the firm and the Wiatts were potential valuable clients and business referral sources, Bristol engaged in a wide-ranging, general representation of the Wiatts, in connection with their business and investment activities.

56.     Specifically, Winston & Strawn and Bristol represented and advised the Wiatts in connection with at least the following complex business matters: (1) providing Jim Wiatt with legal advice and services relating to his separation agreement from his former employer William Morris Agency; (2) monitoring and advising the Wiatts with respect to their investment activities; (3) providing Jim Wiatt with legal advice and services relating to an indemnification agreement with OneCast, Inc.; (4) providing Jim Wiatt with legal advice and services relating to

14

his responsibilities as a potential board member for public and private companies; and (5)
providing legal advice and services relating to potential consulting agreements

57.     At all times during Bristol's representation of the Wiatts, Bristol acted with the
apparent authority of Winston & Strawn.  In communications with Wiatt, Bristol expressly
confirmed that he would represent the Wiatts in his capacity as a partner of Winston & Strawn,
and implicitly by communicating with the Wiatts from his Winston & Strawn office and Winston
& Strawn email account.

58.     All of Bristol's written communications with Jim Wiatt were through his email
account at Winston & Strawn or in writing on Winston & Strawn letterhead.  Bristol's
communications with the Wiatts often prominently displayed the designation "Attorney-Client
Privileged Communication."  Wiatt and Bristol frequently communicated with one another by
telephone calls to and from Bristol's office at Winston & Strawn.  At various times when Jim
Wiatt called Bristol at Winston & Strawn's offices, Wiatt spoke with Winston & Strawn
employees who assisted Bristol with his legal practice.

59.     At all times Jim Wiatt considered Bristol and Winston & Strawn to be his
attorneys and believed Bristol was always protecting his business and investment interests.  Jim
Wiatt relied on the legal advice and services of Bristol and Winston & Strawn.  As Bristol was
aware, Wiatt openly and publicly referred to Bristol and Winston & Strawn as his lawyers.  For
example, on February 10, 2010, Wiatt responded to an email from the Founder and CEO of
Logicwireless and copied Bristol (at his Winston & Strawn email address), as well as Starr,
stating, "I am copying my business manager and lawyer, for their opinions."  Bristol, for his part,
represented to the SEC that, in his capacity as a partner of Winston & Strawn, he had
"represented Jim Wiatt in connection with various matters."

60.     Bristol also referred at least some of the Wiatts' matters to Winston & Strawn's conflict check department, including in January 2010 when the details of those matters were circulated to all of the attorneys in Winston & Strawn.

      1)  *November 2009*

61.     As early as November 2009, as a part of his general representation of the Wiatts, Bristol actively monitored the Wiatts' business and investment activities and advised the Wiatts in connection with those activities.

62.     On or about November 3, 2009, Bristol reached out to Graff about the Wiatts' investment activities and requested an investment summary.  After receiving authorization from the Wiatts, Graff sent Bristol a detailed investment allocation for the Wiatts.

63.     From that point on, the Wiatts believed that Bristol's overall representation of them included protecting their investment interests, and they expected Bristol to communicate his advice to both the Wiatts and the Starr Defendants as a part of his general representation of the Wiatts.

64.     Also on or about November 3, 2009, at Jim Wiatt's request, Bristol reviewed an offer letter for a consulting agreement, and advised him on issues relating to the value of Wiatt's stock option rights and his exposure to liability.  Bristol also communicated at least some of this advice directly to the Starr Defendants.

      2)  *December 2009*

65.     Beginning on or about December 4, 2009, Bristol reviewed documents and provided Jim Wiatt with legal advice in connection with a Google/YouTube Inbound Services Agreement.  Between December 4 and December 15, 2009, Bristol emailed and spoke to Wiatt, as well as directly to Starr and Graff, regarding this legal advice and suggested revisions to the

draft.  Bristol also prepared a draft email for Jim Wiatt to adopt and send in connection with the proposed agreement and later helped Wiatt prepare for a December 15, 2009 meeting.

66.     During that same time period, Bristol provided Wiatt with additional advice concerning a proposed consulting agreement and potential stock warrants Wiatt would receive under that agreement.

### 3) *January 2010*

67.     In January 2010, Bristol continued to provide Jim Wiatt with advice in connection with his business and investment activities, and communicated that advice to both Wiatt and Starr.

68.     On or about January 4, 2010, Wiatt requested that Bristol provide Wiatt and Starr with his advice and analysis relating to a separation and release agreement.  Throughout January 2010, Bristol provided both Wiatt and Starr with his advice and legal analysis on this matter.  Bristol communicated back and forth with Wiatt from his Winston & Strawn email account, frequently copying or updating Starr and/or Graff on those communications.  Bristol also prominently designated many of his communications as "Attorney-Client Privileged Communications."

69.     In connection with these complex legal employment and corporate issues, Bristol prepared at least two legal memoranda for Jim Wiatt, on January 5 and 6, 2010, respectively (each an "Internal Memorandum").  These memoranda were written on Winston & Strawn letterhead, designated as "Attorney-Client Privileged" materials, and saved on Winston & Strawn's network with the firm's DocsOpen software .

70.     The January 5, 2010 Internal Memorandum from Bristol to Jim Wiatt, on Winston & Strawn letterhead and designated "Confidential: Attorney Client Privileged Communication or

Work Product," is a five-page memo addressing Jim Wiatt's separation agreement with a former employer.  Similarly, the January 6, 2010 Internal Memorandum from Bristol to Jim Wiatt, on Winston & Strawn letterhead and designated "Confidential: Attorney Client Privileged Communication or Work Product," is a three-page memo addressing additional aspects of Jim Wiatt's separation agreement with a former employer.

71.     Surrounding Bristol's provision of these memoranda, Bristol exchanged numerous emails with Jim Wiatt using Bristol's Winston & Strawn email account and displaying his Winston & Strawn office number.  On January 6, 2010, Bristol told Wiatt, via an email from his Winston & Strawn email account, "I feel blessed to be able to work on matters with you."

72.     On or about January 15, 2010, Wiatt sought Bristol's advice relating to a potential consulting agreement with a private company, including the potential for an investment stake in the company, copying Starr on at least one email.

73.     Also on or about January 15, 2010, Wiatt sought Bristol's advice in connection with a potential deal with OneCast, Inc., including with respect to a stock option agreement, shareholder rights, and an indemnification agreement.

74.     Bristol reviewed the proposed OneCast agreement and communicated his legal advice to both Wiatt and Starr.  Bristol and Wiatt also communicated with at least one other Winston & Strawn employee, Bristol's legal assistant Laura Quinn, about the matter.

### 4) *February 2010*

75.     Throughout February 2010, Bristol continued to provide Wiatt with legal advice in connection with general corporate and investment matters, as well as in connection with the OneCast agreement and other potential consulting agreements.  Bristol continued to communicate his advice to Wiatt, and at Wiatt's request, he also relayed that advice to Starr.

76.     On or about February 2, 2010, on behalf of Wiatt, the Starr Defendants sent Bristol proposed filings with the State of California for Wiatt's limited liability company.

77.     During early February 2010, Bristol extensively revised the proposed indemnification agreement between Jim Wiatt and OneCast, Inc., which he saved on Winston & Strawn's network in numerous drafts with DocsOpen.  Bristol sent his revisions to Wiatt on February 11, 2010, and copied Starr.

78.     The OneCast agreement identified Bristol as a party to be copied on any notice or communication with Jim Wiatt related to the agreement.  It listed the following contact information at Winston & Strawn:

> Jonathan Bristol, Esq.
> Winston & Strawn LLP
> 200 Park Avenue
> New York, New York 10166
> Office: 212.294.4747
> Email: jbristol@winston.com

79.     In late February 2010, Bristol continued to make revisions to the OneCast agreement and he sent Wiatt a new markup of the agreement on February 23, 2010.

*5) March 2010*

80.     During March 2010, Wiatt and the Starr Defendants continued to communicate with Bristol in connection with general corporate and investment matters, including Wiatt's employment agreements and his limited liability company filing.

81.     In March 2010, Bristol also provided the Wiatts with legal advice and services in connection with the Wiatts' investment activities with Starr.  Jim Wiatt told Bristol that he was dissatisfied with one of his investments that Starr had arranged with a close friend and business associate.  In response, Bristol told Jim Wiatt that he would try to get his money back for him and asked for Wiatt to identify any other Starr investments that Wiatt may wish to recover.

6) *May 2010*

82.     During May 2010, Jim Wiatt continued to request and receive legal advice from Bristol about complex employment and investment related matters.

83.     On May 14, 2010, the SEC reached out to the General Counsel for a company that Jim Wiatt was connected to asking to speak to Wiatt's attorney.  When the General Counsel alerted Wiatt, Wiatt initially thought the SEC's investigation somehow related to his work for that company.

84.     After learning that the SEC's investigation related to Starr, Wiatt phoned Starr for his advice.  Starr told him that the SEC investigation was probably one of "many" investigations being carried out of "investment advisors" in the wake of the Madoff scandal; that it was just "routine" and that there was "nothing to worry about."  Starr recommended to Wiatt that he contact Bristol for guidance.

85.     On May 16, 2010, Wiatt exchanged emails with Bristol, on Bristol's Winston & Strawn email account, and asked Bristol "do I have anything to worry about.  I can't imagine why they would be calling me."

86.     After repeated attempts to reach Bristol by telephone and email, Wiatt emailed Starr stating "He hasn't returned my calls or emails.  Am I in trouble."  Starr responded stating "No – I spoke to jonathan – He knows casey and put a call into him – he said it is absolutely normal – He is probably looking into an investment that was made – no problem for you at all – Jonathan will speak to him tomorrow and take care of it - …"  Starr went on to state that "He just returned from a business trip to Barbados – and I guess he wanted a little time off from business – I called him – he said he would take care of it and it was basically nothing -"

87.     When Wiatt finally spoke with Bristol, Bristol echoed the explanation of Starr telling Wiatt that his "understanding" was that this was a routine investigation and that many other investment advisors were being investigated in the wake of the Madoff case.  At that point, Wiatt asked Bristol point blank whether he should be worried about entrusting his finances with Starr and whether he was "another Bernie Madoff."  Bristol stated vehemently that this was not the case and that "there was nothing for [Wiatt] to worry about."

88.     At the conclusion of the conversation, Bristol advised Wiatt that his law firm, Winston & Strawn, was representing the Starr entities in some respects with regard to other matters and that he would need Wiatt to "waive" any potential conflicts that might exist if Bristol represented Wiatt.  Since Wiatt believed that Bristol was acting in his best interests he agreed to waive the conflict and asked Bristol to represent him in discussions with the SEC.

89.     During and immediately after this time, Bristol had a number of telephone conversations and email exchanges with SEC attorneys. On May 17, 2010, Bristol reached out to the SEC leaving his contact details at Winston & Strawn.  The SEC responded by email to Bristol at his Winston & Strawn email address asking to arrange a meeting with Wiatts' attorneys.

90.     On May 18, 2010, Bristol wrote to the SEC, in his capacity as a Capital Partner of Winston & Strawn, and stated, "I've represented Jim Wiatt in connection with various matters. Jim has asked me (knowing that Winston & Strawn is representing Starr Investment Advisors, Starr & Company, and Kenneth I. Starr in connection with the SEC matter) whether I could participate in the phone conference with Jim and you."  The SEC responded by requesting a meeting with Wiatt.

91.     Over the next week, Bristol and other Winston & Strawn employees, including Bristol's legal assistant Laura Quinn, continued to communicate with Jim Wiatt in connection with the SEC's request for a meeting.  Eventually, Bristol scheduled a telephone interview with the SEC for May 28, 2010, between Jim Wiatt, with Bristol as his counsel, and the SEC to discuss Starr and Bristol's unauthorized wire transfers.

92.     During that same week, in addition to preparing Wiatt for the SEC matter, Bristol continued to provide Wiatt with legal advice in connection with Wiatt's employment agreements.

93.     After the Federal Government arrested Starr, the May 28, 2010 telephone interview did not occur as scheduled, and was ultimately rescheduled with subsequent counsel. The Wiatts later learned of the Federal Government's complaints against Starr in the United States District Court for the Southern District of New York alleging Starr's fraudulent scheme to misappropriate client investment funds.

### D. Bristol's and Starr's Fraudulent Scheme to Steal and Launder Starr's Clients' Funds

94.     There is no question that from July 2009 to May 2010, Bristol knowingly used his Attorney Trust Account to help Starr steal and launder nearly $20 million, including $2 million from the Wiatts.

95.     On or about June 10, 2010, the Federal Government unsealed an Indictment against Starr charging him with two types of schemes to defraud his clients.  (Ex. A).  First, in circumstances where Starr exercised direct control over his clients' finances, Starr made unauthorized transfers of funds to himself, his family, his business, and/or his business associates without disclosing them to his clients.  Second, Starr defrauded his clients by misleadingly inducing them to invest in risky, illiquid businesses and ventures in which he, his wife, or his

business associates often held undisclosed material financial interests.  When Starr's clients demanded refunds for these frauds, Starr used funds from other clients' accounts to pay them.

96.     On or about September 10, 2010, Starr pled guilty to wire fraud, money laundering and investment advisory fraud, including specifically wire fraud in connection with the unauthorized January Transfer of the Wiatts' money, and money laundering in connection with, *inter alia*, the unauthorized January and April Transfers of the Wiatts' money.  (Ex. B).

97.     The Federal Government's investigation into Starr revealed that Bristol was a co-conspirator in Starr's scheme, and, on or about December 14, 2010, U.S. Attorney Preet Bharara and the IRS unsealed an Indictment against Bristol charging him with money laundering in connection with Starr's fraud.  (Ex. C).  On December 16, 2010, the SEC amended its complaint against Starr to allege claims against Bristol for aiding and abetting Starr's securities violations. (Ex. D).

98.     According to Bristol's Indictment, while working as a Capital Partner of Winston & Strawn, Bristol helped Starr defraud clients and conceal Starr's criminal activities by using his Attorney Trust Account to launder the funds stolen by Starr.  Bristol agreed to this scheme, at least in part, for the purpose of building his business in order to maintain his position as a Capital Partner of Winston & Strawn.  (Ex. C).

99.     On or about April 20, 2011, Bristol entered into a criminal plea agreement, in which he admitted to conspiring to launder funds for Starr using his Attorney Trust Account, including specifically with respect to the unauthorized April Transfer of the Wiatts' money.  (Ex. E, publicly available at

http://www.nypost.com/r/nypost/2011/05/02/news/media/050211_Bristol_Jonathan_Plea_Agreement.pdf (last visited August 22, 2011))

100.   At all times during Starr's and Bristol's scheme, Bristol was a Capital Partner of Winston & Strawn, and Bristol used his Attorney Trust Account with the knowledge and apparent authority of Winston & Strawn to perform firm business for Starr, including to pay Starr's legal fees and to fund Starr's legal settlement of a Winston & Strawn matter.

101.   Indeed, on or about June 10, 2010, Winston & Strawn entered into a Consent Seizure Order, whereby Winston & Strawn surrendered $200,000 to the United States, based on Winston & Strawn's receipt of the following funds, which the United States believes to be traceable to Starr's criminal offenses: (i) "on or about January 20, 2010, $100,000 . . . debited from the Attorney Account for an official check in the same amount payable to the order of Winston & Strawn, LLP;" and (ii) "on or about March 17, 2010, $100,000 . . . debited from the Attorney Account for an official check in the same amount payable to the order of Winston & Strawn, LLP."  (Exs. F, G).

102.   Bristol's use of his Attorney Trust Account to divert the Wiatts' funds -- specifically the unauthorized January and April Transfers -- represented a clear breach of Bristol's and Winston & Strawn's attorney-client and fiduciary duties to the Wiatts.

> 1)   *Starr's Agreement with Bristol to Use Bristol's Attorney Trust Account for Unauthorized Transfers of Starr's Clients' Funds*

103.   Starr and Bristol began their scheme in or about July 2009.  In Starr's guilty plea, he admitted that while acting as a financial adviser, his clients entrusted him with their money to pay their bills and invest their funds.  From 2009 to 2010, instead of using his clients' money as promised, he knowingly diverted their money for his own purposes.  Starr admitted that he wired client money into an attorney trust account in New Jersey, belonging to Bristol, in order to conceal the true source of the stolen funds.  (*See* Ex. B).

104.    In Bristol's guilty plea, he corroborated Starr's admissions, and he further admitted that, starting in about July 2009, he knowingly conspired with Starr for the purpose of using his Attorney Trust Account to steal and launder funds that had been entrusted to Starr by his clients.  Bristol also admitted that he knew that helping Starr launder client funds using his Attorney Trust Account was wrong and illegal.  (*See* Exs. E, H, I).

105.    Bristol admitted that from July 2009 through May 2010, he did, in fact, use his Attorney Trust Account to accept wire transfers of funds stolen from Starr's clients and diverted those funds for Starr's fraudulent use, including by regularly transferring stolen funds to the Starr Defendants to pay the companies' operating expenses or as Starr otherwise directed.

106.    While Bristol and Starr admitted to participating in a scheme that generally defrauded Starr's clients out of nearly $20 million, they specifically pled guilty to the overt acts involved in the unauthorized January and April Transfers of the Wiatts' money.

### 2) *Bristol Used His Attorney Trust Account for the Unauthorized January Transfer of the Wiatts' Money*

107.    In Starr's guilty plea, he admitted to causing the unauthorized January Transfer, by which the Starr Defendants transferred $1 million of the Wiatts' funds to Bristol's Attorney Trust Account, and directed that those funds be diverted to Starr his business and personal use.  Starr also admitted that it was improper to use clients' money for his own purposes.

108.    It is evident that Bristol knew that the January Transfer belonged to Starr's clients because he specifically admitted to knowingly using his Attorney Trust Account for the purpose of laundering stolen funds.  Bristol knew that those funds belonged to the Wiatts because, for example, the account statement for his Attorney Trust Account listed a transaction described as "WIRE TRANSFER INCOMING JAMES A OR ELIZABETH RIEGER WIATT," for the amount of $1,000,000, on January 5, 2010.

25

109.     Bristol and Winston & Strawn facilitated and benefited from Starr's theft of client funds generally, and specifically from the January Transfer.  On or about January 7, 2010, Bristol used the Wiatts' stolen funds to settle a Winston & Strawn client matter involving Starr's dispute with a former client, Neil Simon.  Although the parties had earlier settled those claims, Starr had failed to make the payments required by the settlement.  Faced with pressure to resolve the parties' dispute, Bristol transferred $4,000,000 of stolen client funds from his Attorney Trust Account to Neil Simon, including at least some of the $1 million Starr had diverted from the Wiatts' Managed Account.

110.     Bristol made this transfer with the apparent authority of Winston & Strawn.  On January 6, 2010, for example, Bristol emailed Neil Simon's attorney, from his Winston & Strawn email account, to say that he had received $3,000,000 into his Attorney Trust Account and he was expecting the $1 million balance (*i.e.*, the funds stolen from the Wiatts) to be credited to his account by the end of that day.  In this way, in the course of Bristol and Winston & Strawn providing legal services to Starr, they facilitated Starr's theft from another firm client, the Wiatts.

### 3) *Bristol Used His Attorney Trust Account for Unauthorized Transfers that Benefited Winston & Strawn*

111.     Throughout January 2010, Bristol faced pressure from Winston & Strawn about Starr's failure to pay legal fees he incurred.  On January 20, 2010, in response to that pressure, Bristol used funds stolen from Starr's clients to make a $100,000 payment to Winston & Strawn, by official check payable to Winston & Strawn from Bristol's Attorney Trust Account.

112.     Winston & Strawn was thus aware that Bristol was using his Attorney Trust Account to conduct firm business for Starr (*e.g.*, the check came from the TD Bank account for "JONATHAN S BRISTOL ESQ"), and it benefited by receiving payments from that account.

113.    The scheme continued unabated from January through April 2010.  During that time, Bristol knowingly received numerous unauthorized client transfers and made numerous outgoing transfers for Starr's business and personal use.

114.    As set forth in Bristol's Indictment, during March 2010 Bristol reported to Winston & Strawn's senior management that Starr would be paying $100,000 of at least $750,000 owed by Starr for Winston & Strawn's legal services.

115.    Later that month, on March 17, 2010, Bristol again used funds stolen from Starr's clients to make a $100,000 payment to Winston & Strawn, by official check payable to Winston & Strawn from Bristol's Attorney Trust Account.

116.    In or about April 13-16, 2010, Bristol received over $7 million of stolen client funds into his attorney trust accounts, including $1 million from Uma Thurman, for the purpose of laundering the money and using it to purchase a luxury condominium for Starr.  According to Bristol's Attorney Trust Account statement, on April 16, 2010, he transferred $6 million out of his account, to Todman, Nachamie, Spizz & Johns, P.C., for the purpose of purchasing the luxury condominium.

### 4)   *Bristol Used his Attorney Trust Account for the Unauthorized April Transfer of the Wiatts' Money*

117.    As set forth in Bristol's Indictment, Starr and Bristol conducted a second theft from the Wiatts' Managed Account in order cover up their theft from Uma Thurman's account. (Ex. C).  Specifically, the SEC's complaint demonstrates that Uma Thurman learned from her bank that $1,000,000 had been wired out of her account and into Bristol's Attorney Trust Account.  With the assistance of her legal team, Thurman confronted Starr in his office and demanded an explanation for the $1,000,000 wire transfer to Bristol's Attorney Trust Account. Starr claimed it was for an investment that did not go through.

27

118.    As further set forth in the IRS' verified criminal complaint (Ex. K):

(a)    Despite his client's request to contact Bristol and have the money returned, Starr claimed that Bristol could not be reached.  The client's legal team took action and contacted Bristol directly at Winston & Strawn about her money sitting in his trust account.  *See id.*

(b)    Bristol claimed to have no knowledge that the funds belonged to her and stated that he thought they belonged to Starr.  He explained that Starr "bungled [him] up on this" and agreed to get the $1,000,000 back to her account.  *See id.*

(c)    This celebrity client's funds apparently were no longer even in Bristol's Attorney Trust Account.  Thus, in order to transfer the $1,000,000 back to this client, Bristol had to find another $1,000,000.  In a classic example of "robbing Peter to pay Paul," Starr stole $1,000,000 from the Wiatts' account and transferred it into Bristol's attorney trust account.  *See id.* ¶¶14(h) - 15.

119.    After a series of follow up telephone conversations that day in which Bristol continuously updated Ms. Thurman on his progress in returning her money, the $1,000,000 was finally transferred back to Ms. Thurman's account thanks to the funds stolen from the Wiatts. *See id.* ¶14(i).

120.    In Bristol's guilty plea, he admitted that, on or about April 26, 2010, he knowingly used his Attorney Trust Account to help Starr steal and launder $1 million from the Wiatts.  Indeed, given the accusations made by Ms. Thurman and Starr's hasty agreement to return her money, Bristol cannot plausibly take the position that he was unaware of Starr's use of his Attorney Trust Account to make unauthorized transfers, at the time of the April Transfer.

121.    Bristol specifically knew that the $1 million he transferred to Uma Thurman belonged to the Wiatts because, for example, the account statement for his Attorney Trust Account listed a transaction described as "WIRE TRANSFER INCOMING JAMES A OR ELIZABETH RIEGER WIATT," for the amount of $1,000,000, on April 26, 2010, and a

transaction described as "WIRE TRANSFER OUTGOING Uma Thurman," for the amount of $1,000,000, on that same day.

122.    Moreover, Bristol and Starr were certainly aware of the misappropriation of the Wiatts' funds because they actively schemed to hide the theft.  On April 26, 2010, the Starr Defendants provided Jim Wiatt with an authorization form for granting Starr permission to transfer $2 million of the Wiatts' funds to UBS for an investment.  Instead of following the authorization, Starr transferred $1 million to Bristol for the purpose of repaying Uma Thurman. Just weeks later, in order to assuage the Wiatts' concerns about their investments with Starr, Bristol falsely told them that he routinely used his Attorney Trust Account to bundle Starr's client funds for investments with UBS.

> ### 5) *Bristol Used His Attorney Trust Account for Unauthorized Transfers After the April Transfer of the Wiatts' Money*

123.    After the April Transfer, Bristol continued to use his Attorney Trust Account to receive stolen client funds and transfer them for Starr's business and personal use.

124.    As of May 4, 2010, Bristol's Attorney Trust Account still had a balance of over $2 million.

125.    On that date, Bristol distributed $2 million to the Starr Defendants directly and for the Starr Defendants' other business purposes, including for the purpose of repaying other Starr clients.

### E.  Throughout Bristol's and Winston & Strawn's Representation of the Wiatts, Starr and Bristol Intentionally and Knowingly Misled the Wiatts

126.    In order to induce Jim Wiatt to engage Bristol and Winston & Strawn as his general representative for business and investment matters, Starr told the Wiatts that Bristol, in his capacity as a partner of Winston & Strawn, was a lawyer who could effectively represent the

Wiatts' best interests.  Bristol expressly and implicitly represented to Wiatt that he would act as his general legal representative, in his capacity as a partner of Winston & Strawn, and he would protect the Wiatts' business and investment interests.

127.    In truth, throughout Bristol's representation, Starr and Bristol misled the Wiatts about the nature of their relationship and its inevitable impact on the Wiatts' business and investment interests.

128.    From the beginning of their attorney-client relationship, Bristol omitted key information about his relationship with Starr that he knew was important to the Wiatts' decision about whether Bristol could effectively represent their interest, including: (1) Bristol and Winston & Strawn represented Starr in connection with an SEC investigation into Starr's improper investment practices, (2) Bristol and Winston & Strawn represented Starr in connection with a dispute with a former client regarding his improper investment practices and failure to make payments due under their settlement agreement, and (3) Starr had used and intended to continue his use of Bristol's Attorney Trust Account to make unauthorized transfers of Starr's client investment funds.

129.    Had the Wiatts known of this information, they would not have engaged Bristol and Winston & Strawn as their counsel and they would have retained different counsel to provide them with advice in connection with their business and investment activities.

130.    Based on this deception, the Wiatts continued to engage Starr and Bristol in representing their business and investment interests, while Starr and Bristol were actually looking out for their own interests to the detriment of the Wiatts.  As a result of Starr's and Bristol's knowing deception, Bristol and Starr misappropriated $2 million from the Wiatts and,

based on the Wiatts' trust in Bristol and Starr, the Wiatts did not discover this fraud until after the FBI arrested Starr on May 27, 2010.

### 1) *Starr's and Bristol's Misrepresentations and Omissions About The January Transfer*

131.     Beginning in September 2009, Jim Wiatt had repeated discussions with Starr about investing funds with his close friend at UBS in California, and had even introduced Starr to his friend.

132.     In or around January 2010, Jim Wiatt specifically informed Starr that he wished to invest $2,000,000 with his friend at UBS.  Starr assured him that he would make an investment with UBS.

133.     At all relevant times, Bristol knew that Wiatt was only interested in investing in legitimate investments and, in conversations with Bristol and Starr both before and after the January Transfer, Wiatt repeatedly emphasized to Bristol and Starr the importance of understanding the return on his investments.

134.     Instead of investing the Wiatts' money with UBS, on January 4, 2010, Starr transferred $1 million of the Wiatts' money to Bristol in order to steal and launder it for Starr's personal use.  As detailed in Section D above, based on their criminal plea agreements and Bristol's TD Bank Statements, Starr and Bristol obviously knew that the January Transfer improperly misappropriated the Wiatts' funds for Starr's personal use.

135.     Despite their fiduciary obligations to disclose this transfer to the Wiatts, and ample opportunity to do so, Starr and Bristol failed to make any disclosure to the Wiatts.

136.     Indeed, Bristol communicated with the Wiatts, in his capacity as a Capital Partner of Winston & Strawn, throughout the months of January, February and March 2010 about the Wiatts' business and investment interests without disclosing the true nature of the unauthorized

January Transfer of the Wiatts' money.  Bristol's omission was particularly egregious considering the frequency and substance of Bristol's communications with the Wiatts while he was performing the January Transfer:

- On January 4, 2010, the day of the January Transfer, Jim Wiatt and Bristol emailed and spoke on the phone to discuss Bristol's legal advice on various business matters.

- On January 5, 2010, the day the January Transfer was credited to Bristol's account, Bristol provided Jim Wiatt with legal advice by email, phone and multi-page legal memoranda on Winston & Strawn letterhead.  Within fifteen minutes of providing Wiatt with the legal memoranda, Bristol emailed Neil Simon's attorney to work out the details of transferring $4 million from his Attorney Trust Account into Neil Simon's account, in settlement of Neil Simon's dispute with Starr.

- On January 6, 2010, Bristol provided Jim Wiatt with legal advice by email and legal memoranda on Winston & Strawn letterhead.  Within hours of Bristol telling Wiatt, "I feel blessed to be able to work on matters with you," he emailed Neil Simon's counsel and said he was just waiting for the January Transfer to clear, so Simon could expect the wire transfer to go through by the next morning.

137.    Despite Bristol's and Starr's fiduciary obligations to protect the Wiatts' investment interests and ample opportunity for them to do so, Bristol and Starr did not disclose the January Transfer to the Wiatts because they did not intend to invest the Wiatts' money with UBS as the Wiatts wished.  Instead, they decided to use the Wiatts' money to pay for Starr's settlement of a client dispute, which was being handled by Bristol and Winston & Strawn.

138.    Throughout this time, Bristol had a general duty to protect and monitor the Wiatts' business and investment interests, particularly in connection with Starr.  Instead, Starr and Bristol misled the Wiatts into believing that Bristol and Winston & Strawn were representing their best interests, when, in fact, they were hiding the theft of $1 million.

139.    The Wiatts did not learn about the January Transfer until in or about March 2010, when the Starr Defendants sent them a monthly financial report for the period ending January 31, 2010.

140.    The Wiatts noticed that this financial report described a $1,000,000 wire transfer from their Managed Account as a "check" sent to Jonathan Bristol and as an "investment" in "UBS."  On or about March 10, 2010, Jim Wiatt asked Graff about this transaction and why the transfer went to Bristol.  Graff falsely informed the Wiatts that Bristol "bundled" the Wiatts' $1,000,000 along with $4,000,000 from other clients for an investment with UBS (*i.e.*, the "cover story").

141.    Jim Wiatt also questioned Starr about the January Transfer and was advised, consistent with the cover story, that Bristol was "bundling" the money with other client funds for a collective investment at UBS, which would yield better rates.  Although Wiatt was concerned that neither Starr nor Bristol had informed him of the nature of this "bundling" investment, he was assuaged by the fact that his trusted attorney was involved in the transaction.  While Wiatt did not understand precisely why his attorney would be involved in the bundling of investment monies, he did not pursue the matter further because he trusted the Starr Defendants and Bristol, and he did not conceive that a Capital Partner of Winston & Strawn would be involved in misappropriating his money.

142.    At all relevant times, Bristol and the Starr Defendants knew that Bristol had not "bundled" any funds for investments with UBS.  By making purposeful misrepresentations and omissions about the investment, Bristol and the Starr Defendants misled Wiatt about the true nature of the January Transfer.  Indeed, Based on Bristol's and Starr's fiduciary responsibilities

to the Wiatts, each party had an independent obligation to disclose to the Wiatts the true nature of the January Transfer, which they breached by providing the Wiatts with their cover story.

143.    When in March 2010, the Wiatts asked Bristol to help them retrieve a separate Starr investment, he agreed to help them, and to identify other problem Starr investments, but he still failed to disclose the true nature of the January Transfer.

144.    In or around May 12, 2010, Jim Wiatt specifically questioned Bristol about the January Transfer.  Like Graff and Starr before him, Bristol reinforced the cover story and falsely informed Wiatt that the $1,000,000 was "bundled" for an investment with UBS.  In truth and in fact, however, and as Bristol well knew, the $1 million had been misappropriated by Starr. Indeed, the consistency of Bristol's and Starr's answers to Wiatt's questions reflects Bristol's long-standing knowledge of the Starr Defendants' cover story about the UBS investment and his long standing failure to correct that cover story.

### 2) *The Starr Defendants' and Bristol's Misrepresentations and Omissions About The April Transfer*

145.    After months of requesting that Starr provide his friend at UBS with money for an investment, Jim Wiatt signed a letter dated April 26, 2010 -- prepared by Starr & Co. and on Starr & Co. letterhead -- authorizing the payment of $2,000,000 to that individual at UBS.

146.    The Starr Defendants did not transfer the $2,000,000 to that individual at UBS as Jim Wiatt directed.

147.    Instead, on or about April 26, 2010 -- the date of Jim Wiatt's authorization letter -- Starr, unbeknownst to the Wiatts, executed another wire transfer of $1,000,000 from the Managed Account to Bristol's Attorney Trust Account, and only later transferred $1,000,000 to UBS.

148.    Jim Wiatt was eventually informed by UBS that they had only received $1,000,000 of the $2,000,000 that they expected to receive.  When Jim Wiatt confronted Starr about this, Starr explained that he was spreading out the $2,000,000 wire transfer in two separate transactions.  At the time, Wiatt did not know that Starr and Bristol had already taken the money from the April Transfer and given it to another of Starr's clients.

149.    Although Bristol had an ongoing attorney-client relationship with Jim Wiatt, and he should have been advancing the interests of his client, Bristol nevertheless breached his fiduciary duties to Jim Wiatt when he obtained the Wiatts' funds to "reimburse" Starr's celebrity client.

### 3)   *The Starr Defendants' and Bristol's Misrepresentations and Omissions To Hide and Conceal the Fraudulent Transfers*

150.    Even after the SEC reached out to Wiatt, through the General Counsel of a company connected to Wiatt, in order to arrange a meeting with Wiatt's counsel, Starr and Bristol continued to conspire to hide the truth about the unauthorized transfers.

151.    When Wiatt called Starr for information about the investigation, Starr told him that the SEC investigation was probably one of "many" investigations being carried out of "investment advisors" in the wake of the Madoff scandal; that it was just "routine" and that there was "nothing to worry about."   In a separate call, Starr said, "it is absolutely normal – [The SEC] is probably looking into an investment that was made – no problem for you at all . . . [Bristol] said he would take care of it and it was basically nothing."

152.    At no time did Starr acknowledge: (i) that he was a target of the investigation; (ii) that he had already been interviewed by the Federal Government on or about March 10, 2010; or (iii) that Bristol was representing him in connection with the SEC investigation.

153.    When Wiatt spoke with Bristol, Bristol echoed the explanation of Starr telling Wiatt that his "understanding" was that this was a routine investigation and that many other investment advisors were being investigated in the wake of the Madoff case.  At that point, Wiatt asked Bristol point blank whether he should be worried about entrusting his finances with Starr and whether he was "another Bernie Madoff."  Bristol stated vehemently that this was not the case and that "there was nothing for [Wiatt] to worry about."

154.    Bristol did not disclose to Wiatt: (i) that Bristol had assisted Starr in stealing $2 million from the Wiatts through the use of his Attorney Trust Account; (ii) that Bristol himself and his Attorney Trust Account were potential targets or subjects of the investigation; or (iii) that Bristol was already representing Starr in connection with the SEC investigation.

155.     Both before and during these conversations with the SEC, Bristol and Starr learned information concerning the SEC's investigation that was material to Bristol's ability to effectively represent the Wiatts and the status of the Wiatts' investment funds.  Despite this fact, Bristol and Winston & Strawn failed to convey this material and critical information to the Wiatts.

156.    If the Wiatts had learned of the true nature of the unauthorized January and April Transfers of their money at any time prior to May 27, 2010, they would have immediately put a stop to the transfers and/or demanded and received the return of their money from Starr and Bristol, as did other Starr investors, or take action to freeze Bristol's and Starr's bank accounts.

### F.  Winston & Strawn's Attempts to Hide Its Role and Responsibility for Starr's Conspiracy with Bristol

157.    At all relevant times, Bristol was a Capital Partner of Winston & Strawn, and Winston & Strawn had a duty and the ability to supervise and control Bristol.

158.    While working as a Capital Partner for Winston & Strawn, Bristol conspired and agreed with Winston & Strawn's client, Starr, to defraud Starr's clients and launder their money through his Attorney Trust Account.  From in or about July 2009 through May 2010, Bristol did use his Attorney Trust Account to help Starr steal and launder nearly $20 million from Starr's clients, including $2 million from Winston & Strawn client Jim Wiatt.

159.    Winston & Strawn knew or should have known that its Capital Partner was conspiring with one of its clients to defraud client investors out of nearly $20 million, using the Capital Partner's Attorney Trust Account to launder that money, because Winston & Strawn should have realized, at some point during the 10-month scheme, that its Capital Partner was using firm resources and spending firm time committing such a massive fraud.

160.    Moreover, Winston & Strawn knew or should have known that its Capital Partner was conspiring with one of the firm's clients to defraud a second firm client on two occasions, because Winston & Strawn should have reasonable protections in place to make sure that its attorneys, including Capital Partners, are never in a position to help one client steal from another client.  At the very least, after the first theft, Winston & Strawn should have been aware of, and put a stop to, the second theft.

161.    By at least March 2010, Winston & Strawn knew or should have known that Bristol might engage in improper conduct; however, it ignored the warning signals, including the fact that Starr was under investigation by the SEC for improper investment practices, Starr was having trouble paying his legal bills, and Bristol paid $200,000 of Starr's legal bills out of his Attorney Trust Account.

162.    Knowing these facts, Winston & Strawn had an obligation to investigate and monitor Bristol's activities, and, if it had conducted even a reasonably diligent investigation, or

indeed any monitoring of its Capital Partner's activities, Winston & Strawn would have discovered that Bristol was, in fact, engaging in a scheme to defraud Starr's investors, including Winston & Strawn's client, the Wiatts.

163.   Winston & Strawn never disclosed such a discovery.  Instead, when it became public knowledge that Bristol was named in the criminal complaint against Starr as "Associate-4," Winston & Strawn went to enormous efforts to erase all evidence of its role in Starr's conspiracy with Bristol to defraud the Wiatts and other Starr clients, including by denying its association with its Capital Partner Bristol and its representation of the Wiatts.

164.   Although Bristol and Winston & Strawn had been representing both the Starr Defendants and the Wiatts in connection with the SEC investigation, after Starr's arrest, they immediately ceased communications with the Wiatts.

165.   Subsequently, on June 4, 2010, Winston & Strawn filed a Notice of Withdrawal in the SEC action stating "Pursuant to the Court's request at the June 1, 2010 hearing in this matter, Winston & Strawn LLP hereby confirms that no attorney from Winston & Strawn LLP is representing any party in this case."  (Ex. J).

166.   Not only did Winston & Strawn cease its public association with Bristol and his clients, it scrubbed Bristol and any hint of his presence at Winston & Strawn from its website. Indeed, the firm went back and actually reworked its November 19, 2008 press release announcing that Bristol was joining the firm as a partner to entirely remove his name (as well as attending descriptions such as how many new lawyers were joining the firm) from the release.

167.   This active concealment of Bristol's connection to Winston & Strawn is notable considering that Bristol was a Capital Partner of Winston & Strawn, which means that Bristol had an equity stake in the firm.

## CAUSES OF ACTION

### COUNT I
### (Breach of Fiduciary Duty)
### (Against Bristol and Winston & Strawn)

168.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

169.    By virtue of the foregoing, Bristol and Winston & Strawn have breached their fiduciary duties to Plaintiffs.

170.    Through their positions as Plaintiffs' entrusted attorneys, and because of their ability to control Plaintiffs' money in their attorney trust accounts, Defendants owed Plaintiffs fiduciary obligations of trust, loyalty, good faith and due care, and were required to use their utmost ability to manage Plaintiffs' money and communicate any conflicts or malfeasance in a fair, just, honest and equitable manner.

171.    As fiduciaries, to discharge these duties, Defendants were and are required to exercise prudent supervision over their attorney-client relationship with Plaintiffs.

172.    Defendants had a duty and ample opportunity to discuss material information with Plaintiffs.

173.    Bristol and Winston & Strawn have further failed to give Plaintiffs any explanation of what happened to Plaintiffs' funds that were diverted to their attorney trust accounts.

174.    Defendants' conduct, as set forth herein, constitutes conscious misbehavior and recklessness.  Each of Defendants was and is responsible for the attorney-client relationship as a whole.

175.    Defendants breached, and continue to breach, their fiduciary duties, causing damage to Plaintiffs.

176.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT II
### (Breach of Fiduciary Duty)
### (Against Starr Defendants)

177.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

178.    The Starr Defendants were Plaintiffs' entrusted investment advisors and business managers, and through their fiduciary relationship of trust, exercised control over Plaintiffs' money in their fiduciary accounts, as alleged in specific detail in paragraphs 33 through 42. Plaintiffs placed their trust and confidence in the Starr Defendants by entrusting them with managing their financial affairs.

179.    The Starr Defendants owed Plaintiffs fiduciary obligations of trust, loyalty, good faith and due care.  To discharge these duties, the Starr Defendants were and are required to exercise prudent supervision over their fiduciary relationship with Plaintiffs, and to use their utmost ability to manage Plaintiffs' money, hold it in trust, and communicate any conflicts or malfeasance in a fair, just, honest and equitable manner.  Plaintiffs, given that fiduciary relationship, had a legal right to expect that the Starr Defendants would not steal their money.

180.    As alleged in specific detail in paragraphs 94 through 125, the Starr Defendants violated Plaintiffs' trust and breached their fiduciary duties to the Wiatts when they stole $2 million from the Wiatts' Managed Account by transferring it into Bristol's Attorney Trust

Account without the Wiatts' authorization.  They further violated the Wiatts' trust when they directed Bristol to divert those funds for the Starr Defendants' use, including, *inter alia*, Starr's business expenses, legal fees, repayment of other Starr clients, and Starr's purchase of a luxury condominium.

181.    As alleged in specific detail in paragraphs 126 through 156, the Starr Defendants also violated the Wiatts' trust and breached their fiduciary duties to the Wiatts by failing to disclose the unauthorized January and April Transfers of the Wiatts' money, and by making material misrepresentations, affirmatively and by omission, about those transfers. The Starr Defendants have failed to give Jim Wiatt any explanation of what happened to Plaintiffs' funds that were diverted from their fiduciary accounts.

182.    Through their continuing failure to return Plaintiffs' stolen monies, the Starr Defendants continue to breach their fiduciary duties to the Wiatts.

183.    The Starr Defendants' conduct constitutes conscious misbehavior and recklessness.

184.    The Starr Defendants' breaches of their fiduciary duties proximately caused the Plaintiffs' damages.

185.    If the Starr Defendants had performed their fiduciary obligations and duties to the Wiatts and refrained from violating their trust, they would not have made the unauthorized January and April Transfers, or otherwise misappropriated the Wiatts' money for their personal use, and the Wiatts would not have lost $2 million.

186.    If, at any time prior to May 27, 2010, the Starr Defendants had told the Wiatts the truth about the unauthorized January and April Transfers, the Wiatts could have successfully demanded and recovered their funds from Bristol and Starr, as did other Starr clients, or taken

action to freeze the Starr Defendants' and Bristol's bank accounts.  As late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account, and on that date he returned the money directly to certain Starr investors.

187.    The Starr Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial.  The Starr Defendants should be punished for their egregious misconduct.  Accordingly, Plaintiffs are entitled to punitive damages in order to deter them and others in their positions from engaging in the same or similar conduct in the future.

### COUNT III
### (Aiding and Abetting Breach of Fiduciary Duty)
### (Against Bristol and Winston & Strawn)

188.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

189.    The Starr Defendants were Plaintiffs' entrusted investment advisors and business managers, and through their fiduciary relationship of trust, exercised control over Plaintiffs' money in their fiduciary accounts, as alleged in specific detail in paragraphs 33 through 42. Plaintiffs placed their trust and confidence in the Starr Defendants by entrusting them with managing their financial affairs.

190.    The Starr Defendants owed Plaintiffs fiduciary obligations of trust, loyalty, good faith and due care.  To discharge these duties, the Starr Defendants were and are required to exercise prudent supervision over their fiduciary relationship with Plaintiffs, and to use their utmost ability to manage Plaintiffs' money, hold it in trust, and communicate any conflicts or

malfeasance in a fair, just, honest and equitable manner.  Plaintiffs, given that fiduciary relationship, had a legal right to expect that the Starr Defendants would not steal their money.

191.    As set forth in Count II above, the Starr Defendants violated Plaintiffs' trust and breached their fiduciary duties to the Wiatts

192.    As alleged in specific detail in paragraphs 52, 54, 61-64, 65, 68, 72, 74-76, 80-81, 86-76, 94-125, Bristol and Winston & Strawn had knowledge of the fiduciary relationship between the Starr Defendants and the Wiatts given Bristol's personal and professional relationship with Kenneth Starr and Bristol's conduct in conspiring with Starr to steal money from the Wiatts.

193.     As alleged in specific detail in paragraphs 94 through 125, Bristol knowingly helped and encouraged the Starr Defendants to commit wrongful acts against Starr's clients.  In his guilty plea, Bristol admitted that from in or about July 2009 through May 2010, Bristol knowingly conspired with Starr for the purpose of using Bristol's Attorney Trust Account to steal Starr's clients' funds.  Bristol admitted that he used the Attorney Trust Account to accept wire transfers of funds stolen from Starr's clients and then diverted those funds for the benefit of Starr, Bristol and Winston & Strawn.

194.    As alleged in specific detail in paragraphs 103 through 122, Bristol and Winston & Strawn knowingly helped and encouraged the Starr Defendants to commit wrongful acts against the Wiatts specifically by using Bristol's Attorney Trust Account for the unauthorized January and April Transfers of the Wiatts' money, to divert the Wiatts' funds for unauthorized purposes, and to hide this theft from the Wiatts.

195.    Bristol and Winston & Strawn knew that the Starr Defendants' conduct constituted a breach of their fiduciary duties to the Plaintiffs given that the transfers between the

Managed Account and Bristol's Attorney Trust Account were accomplished without informing Plaintiffs of the transfers, and then further transferred to sources that benefited the Starr Defendants.

196.   Accordingly, Bristol and Winston & Strawn knowingly and willfully provided substantial assistance and encouragement to the Starr Defendants in connection with their breaches of fiduciary duties, thus aiding and abetting the Starr Defendants' breaches of their fiduciary duties.

197.   Bristol's and Winston & Strawn's actions in aiding and abetting these breaches of fiduciary duties proximately caused the Plaintiffs' damages.

198.   If Bristol and Winston & Strawn had not helped the Starr Defendants to breach their fiduciary duties to the Wiatts, the Starr Defendants would not have accomplished the January and April Transfers or the diversion of those funds for Starr's use and the Wiatts would not have lost $2 million.  Absent Bristol's assistance in laundering those funds, Starr could not have successfully concealed his thefts.

199.   If, at any time prior to May 27, 2010, Bristol and Winston & Strawn had ceased their support and encouragement of Starr's scheme, the Wiatts would have discovered the scheme and they could have demanded and recovered their funds from Bristol and Starr, as did other Starr clients, or taken action to freeze the Starr Defendants' and Bristol's bank accounts. As late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account, and on that date he returned money directly to certain Starr investors.

200.   Winston & Strawn is vicariously liable for Bristol's tortious actions because, at all relevant times, when Bristol was aiding and abetting Starr's activities, he was acting within the scope of his employment as a Capital Partner at Winston & Strawn.  When Bristol was assisting

and encouraging Starr to transfer the Wiatts' funds into his Attorney Trust Account for the purpose of funding Starr's settlement with Neil Simon, for example, he was acting within the scope of his attorney responsibilities for Winston & Strawn's client Starr.  In his communications with Neil Simon's counsel about that transfer, he acted with the apparent authority and approval of Winston & Strawn.

201.     When Bristol was performing legal services for the Wiatts in myriad matters he was also acting within the scope of his employment at Winston & Strawn.  His representation was of the kind that Bristol was employed by Winston & Strawn to perform, and occurred substantially within the confines of the Winston & Strawn workday and workspace.  Moreover, Bristol was motivated, at the very least in part, to serve Winston & Strawn by fostering a relationship with a very well known public figure in Jim Wiatt, and his wife Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to more.

## COUNT IV
### (Legal Malpractice)
### (Against Bristol and Winston & Strawn)

202.     Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

203.     Starting in October 2009 and lasting through May 2010, Bristol and Winston & Strawn agreed to represent Plaintiff Jim Wiatt and, during that time period, served as a general attorney representative for the Wiatts' business and investment interests, as alleged in specific detail in paragraphs 52 through 93.

204.     Based on the Wiatts' attorney-client relationship, Bristol and Winston & Strawn had a duty to exercise reasonable care in their representation of the Wiatts, disclose any known or potential conflicts of interest, disclose all information within their knowledge concerning the Wiatts' business and investment interests, act in the Wiatts' best interests with respect to their

business and investment activities, and protect any of the Wiatts' funds that came into their possession or control.

205.    Bristol and Winston & Strawn were also responsible for and had a duty to protect any of the Wiatts' funds that came into their possession or control through Bristol's Attorney Trust Account or otherwise.

206.    As alleged in specific detail in paragraphs 126 through 156, Bristol and Winston & Strawn violated those duties by failing to disclose known and/or potential conflicts of interests and by choosing one client's interests over those of another.  Bristol's and Winston & Strawn's conduct and performance of their legal duties was below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession.

207.    As a direct and proximate result of Bristol's and Winston & Strawn's failure to disclose their conflicts of interest, and by their decision to place Starr's interests ahead of the Wiatts' interests, the Wiatts were injured due to the diversion of their funds through Bristol's Attorney Trust Account.

208.    Bristol's and Winston & Strawn's conflicts of interest were a substantial cause of the Wiatts' $2 million loss because, had Bristol and Winston & Strawn been exercising due care for the Wiatts, they would have disclosed the January and April Transfers to the Wiatts and they would have immediately halted those transfers before the money was diverted to Starr.  Further, Bristol's and Winston & Strawn's failure to disclose the nature of their relationship with Starr delayed the Wiatts' discovery of Starr's theft and prevented them from recovering the stolen funds and/or preventing the April Transfer.  For example, when the Wiatts discovered the unauthorized January Transfer to Bristol's Attorney Trust Account, in or about March 2010, had

it not been for the fact that Bristol was their trusted attorney, the Wiatts would have immediately demanded the return of their money and an explanation and documentation of the transfer.

209.    Based on the Wiatts' attorney-client relationship, Bristol and Winston & Strawn also had a duty to protect the Wiatts' investment interests.

210.    As alleged in specific detail in paragraphs  94 through 125, Bristol and Winston & Strawn violated this duty when Bristol received the January and April Transfers into his Attorney Trust Account, knowing that those funds had been misappropriated from the Wiatts, as well as when he diverted those funds for the Starr Defendants' use.

211.    Moreover, Bristol and Winston & Strawn violated their duties to the Wiatts when Bristol failed to disclose the January and April Transfers of the Wiatts' money, while at the same time, acting in his capacity as Capital Partner of Winston & Strawn, he provided the Wiatts with legal advice in connection with their investment interests, as alleged in specific detail in paragraphs 126 through 156.

212.    As attorneys for the Wiatts, charged with protecting the Wiatts' investment interests, Bristol and Winston & Strawn were responsible for holding the Wiatts' funds in trust, alerting the Wiatts to the transfer, and waiting for instructions from the Wiatts.  By failing to do any of these things, Bristol's and Winston & Strawn's conduct and performance of their legal duties was below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession.

213.    As a direct and proximate result of Bristol's and Winston & Strawn's failure to protect the Wiatts' investment interests, the Wiatts were injured due to the diversion of their funds through Bristol's Attorney Trust Account.

214.     Bristol's failure to protect the Wiatts' investments was a substantial cause of their losses because, if Bristol had stopped the January and April Transfers and reported the transfers to the Wiatts, the Wiatts would have recovered their money from Starr.  Further, Bristol delayed their discovery of Starr's theft and prevented the Wiatts from recovering the stolen funds and/or preventing the April Transfer.  For example, when the Wiatts discovered the unauthorized January Transfer, in or about March 2010, had it not been for the fact that Bristol was their trusted attorney, who was engaged to protect their investment interests, the Wiatts would have immediately demanded the return of their money and an explanation and documentation of the transfer.

215.     Based on the Wiatts' attorney-client relationship, Bristol and Winston & Strawn also had a duty to maintain the Wiatts' investment funds in trust to the extent such funds came into their possession.

216.     As alleged in specific detail in paragraphs 94 through 125, Bristol and Winston & Strawn violated this duty when Bristol knowingly received the unauthorized January and April Transfers of the Wiatts money into his Attorney Trust Account.  Bristol further violated this duty when he knowingly permitted those funds to be diverted for the Starr Defendants' use.

217.     Moreover, Bristol and Winston & Strawn violated their duties to the Wiatts when Bristol failed to hold onto the Wiatts' money that Bristol received through the unauthorized January and April Transfers, while at the same time, acting in his capacity as Capital Partner of Winston & Strawn, he provided the Wiatts with legal advice in connection with their investment interests, as alleged in specific detail in paragraphs 126 through 156.

218.     As attorneys for the Wiatts, charged with maintaining the Wiatts' funds in trust, Bristol and Winston & Strawn were responsible for holding the Wiatts' funds, alerting the Wiatts

to the transfer, and waiting for instructions from the Wiatts. By failing to do any of these things, Bristol's and Winston & Strawn's conduct and performance of their legal duties was below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession.

219.    As a direct and proximate result of Bristol's and Winston & Strawn's failure to maintain the Wiatts' funds in trust, the Wiatts were injured due to the diversion of their funds through Bristol's Attorney Trust Account.

220.    Bristol's failure to maintain the Wiatts' funds in trust was a substantial cause of their losses because Bristol should have stopped the January and April Transfers and reported the transfers to the Wiatts, in which case the Wiatts would have recovered their money from Starr.

221.    If, at any time prior to May 27, 2010, Bristol and Winston & Strawn had performed their obligations and duties as attorneys to the Wiatts, the Wiatts could have stopped the unauthorized transfers, demanded and recovered their funds from Bristol and Starr, as did other Starr clients, or taken action to freeze Bristol's and the Starr Defendants' bank accounts. As late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account, and on that date he returned money directly to certain Starr investors.

222.    Bristol and Winston & Strawn also acted with malice and/or wanton and willful disregard of the foreseeable harm to the Wiatts. They were well aware of the likelihood that serious economic harm to the Wiatts would arise from their representations of the Wiatts, and by placing Starr's interests ahead of the Wiatts. The Wiatts are entitled to punitive damages, in an amount to be determined at trial, because Bristol and Winston & Strawn should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT V
### (Negligent Misrepresentation)
### (Against Bristol & Winston & Strawn)

223.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein, except those allegations that state that Bristol and Winston & Strawn knowingly misled the Wiatts.  All of the preceding allegations of such fraud are specifically excluded from this Count.

224.    Starting in October 2009 and lasting through May 2010, Bristol and Winston & Strawn agreed to represent Jim Wiatt and, during that time period, served as a general attorney representative and fiduciary for the Wiatts' business and investment interests, as alleged in specific detail in paragraphs 52 through 93.

225.    Based on the Wiatts' attorney-client relationship, Bristol and Winston & Strawn had a duty to disclose any known or potential conflicts of interest, disclose all information within their knowledge concerning the Wiatts' business and investment interests, and provide the Wiatts with complete and accurate information about their representation.  From October 2009 through May 2010, Bristol and Winston & Strawn had an ongoing obligation to disclose to the Wiatts complete and accurate information about the Wiatts' business and investment interests as they became known to Bristol and Winston & Strawn.

226.    Contrary to those duties and obligations, Bristol made repeated false statements to the Wiatts, affirmatively and by omission, concerning Bristol's and Winston & Strawn's relationship with Starr and the Wiatts' investment interests.  When Bristol was making false statements in the performance of legal services for the Wiatts in myriad matters, he was acting within the scope of his employment at Winston & Strawn.  His representation was of the kind that Bristol was employed by Winston & Strawn to perform, and occurred substantially within the confines of the Winston & Strawn workday and workspace.  Moreover, Bristol was

motivated, at the very least in part, to serve Winston & Strawn by fostering a relationship with a very well known public figure in Jim Wiatt, and his wife Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to more.

227.     As alleged in specific detail in paragraphs 126 through 156, while acting in his capacity as a Capital Partner of Winston & Strawn, in order to induce the Wiatts to trust his legal services and advice, Bristol negligently misrepresented, affirmatively and by omission, that he had no known conflicts of interest.  Bristol and Winston & Strawn had no reasonable basis to believe that they were conflict free and capable of acting in the Wiatts' best interests.  Further, Bristol knew that Starr had used and intended to use his Attorney Trust Account to make unauthorized transfers of Starr's client investment funds.

228.     Bristol and Winston & Strawn knew or should have known that they were required to disclose potential conflicts of interest due to their representation of Starr and Bristol's use of his Attorney Trust Account for Starr.  Had Bristol and Winston & Strawn employed due care, they would have discovered and known of their misstatements and omissions about their conflicts of interest and disclosed them to the Wiatts.

229.     Bristol and Winston & Strawn knew, or should have known, that the Wiatts would rely upon Bristol's and Winston & Strawn's misrepresentations and omissions about their conflicts of interest by engaging their legal services.

230.     The Wiatts actually, reasonably, foreseeably and justifiably relied upon Bristol's misrepresentations and omissions regarding conflicts of interest, and engaged Bristol's and Winston & Strawn's legal services and permitted Starr and Bristol to remain in fiduciary relationships with them and to continue to provide them with advice and to maintain their accounts.

231.    As a direct and proximate result of Bristol's and Winston & Strawn's misrepresentations and omissions, the Wiatts were induced to permit Starr and Bristol to maintain their accounts, and have sustained damages of no less than the $2 million stolen by Starr and Bristol.  Had the Wiatts' known of Bristol's and Winston & Strawn's conflicts of interest and the fact that Bristol was using his Attorney Trust Account to help Starr misappropriate his clients' investment funds, the Wiatts would have withdrawn their funds from the Starr Defendants and engaged a different law firm to represent their business and investment interests.

232.    As alleged in specific detail in paragraphs 126 through 156, while acting in his capacity as a Capital Partner of Winston & Strawn, Bristol negligently misrepresented, affirmatively and by omission, that he was protecting the Wiatts' investment interests.

233.    As alleged in specific detail in paragraphs 103 through 110, when Bristol received the January Transfer into his Attorney Trust Account, Bristol knew that this money belonged to the Wiatts and that it was not an authorized transfer.  Bristol had an obligation to disclose the January Transfer to the Wiatts and despite ample opportunity he did not make such a disclosure, as alleged in specific detail in paragraphs 126 through 156.  Indeed, in March 2010, Bristol stated that he was continuing to protect the Wiatts' investment interests, but he still failed to disclose the January Transfer or the fact that Starr was using his Attorney Trust Account to make similar transfers.

234.    Bristol knew or should have known that by failing to disclose the January Transfer to the Wiatts, he was misleading them by omission.

235.    As alleged in specific detail in paragraphs 103 through 122, when Bristol received the April Transfer into his Attorney Trust Account, Bristol knew that this money belonged to the

Wiatts and that it was not an authorized transfer. Bristol had an obligation to disclose the April Transfer to the Wiatts and despite ample opportunity he did not make such a disclosure, as alleged in specific detail in paragraphs 145 through 156.

236.    Bristol knew or should have known that by failing to disclose the April Transfer to the Wiatts, he was misleading them by omission.

237.    Bristol and Winston & Strawn knew, or should have known, that the Wiatts would rely upon Bristol's misrepresentations and omissions about protecting their investment interests by continuing to use Bristol's and Starr's legal and fiduciary services.

238.    The Wiatts actually, reasonably, foreseeably and justifiably relied upon Bristol's misrepresentations and omissions about their investment interests, and permitted Starr and Bristol to remain in fiduciary relationships with them and to continue to provide them with advice and maintain their accounts.

239.    As a direct and proximate result of Bristol's and Winston & Strawn's misrepresentations and omissions, the Wiatts were induced to permit Starr and Bristol to maintain their accounts, and have sustained damages in an amount no less than the $2 million stolen by Starr and Bristol. Had the Wiatts' known of the January and April Transfers, the Wiatts would have withdrawn their funds from Starr and engaged a different law firm to represent their business and investment interests.

240.    As alleged in specific detail in paragraphs 139 through 156, while acting in his capacity as a Capital Partner of Winston & Strawn, Bristol adopted and was complicit in the Starr Defendants' cover story about the January Transfer and all of their false statements to the Wiatts that the wire transfers into the Attorney Trust Account were made to facilitate the bundling of investments with UBS, and that this was a routine practice.

241.    On or about May 12, 2012, Bristol falsely told the Wiatts that the January Transfer had been for the purpose of bundling their money for an investment with UBS, using the same false cover story provided by the Starr Defendants to the Wiatts in previous months. Bristol knew or should have known that this statement was false.

242.    In truth, the Wiatts' funds had been misappropriated by Starr and not bundled for an investment with UBS.

243.    By adopting the Starr Defendants' cover story, Bristol became liable not only for his false statements on May 12, 2010, but for all of the Starr Defendants' false statements about bundling the Wiatts' money for an investment with UBS, as alleged in specific detail in paragraphs 139 through 156, as well his omissions during that time, because, by adopting the cover story, Bristol revealed that he participated in a common scheme with the Starr Defendants to conceal the theft of the Wiatts' money during those months.

244.    Bristol and Winston & Strawn had no reasonable basis to believe that the Wiatts' funds had actually been bundled for an investment with UBS.  Had Bristol and Winston & Strawn employed due care, they would have discovered and known of their misstatements and omissions about the Wiatts' investments.

245.    Bristol and Winston & Strawn knew, or should have known, that the Wiatts would rely upon Bristol's and Winston & Strawn's misrepresentations and omissions about their investments by delaying their demand for the return of their funds from Starr.

246.    The Wiatts actually, reasonably, foreseeably and justifiably relied upon Bristol's misrepresentations and omissions about their investments and did not immediately demand that Bristol or Starr return their funds.

247.    As a direct and proximate result of Bristol's and Winston & Strawn's misrepresentations and omissions, the Wiatts lost $2 million in funds misappropriated by Starr.

248.    If, at any time prior to May 27, 2010, Bristol and Winston & Strawn had disclosed the true nature of the January and April Transfers, the Wiatts could have successfully demanded and recovered their funds from Bristol and Starr, as did other Starr clients, or taken action to freeze the Starr Defendants' and Bristol's bank accounts.  As late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account, and on that date he returned money directly to certain Starr investors.

## COUNT VI
## (Negligent Misrepresentation)
## (Against Starr Defendants)

249.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein, except those allegations that state that the Starr Defendants knowingly misled the Wiatts.  All of the preceding allegations of such fraud are specifically excluded from this Count.

250.    For many years, the Starr Defendants have managed the Wiatts' business and investment activities and have acted as fiduciaries to the Wiatts, protecting their financial, business and investment interests, as alleged in specific detail in paragraphs 33 through 42.

251.    Based on the Wiatts' fiduciary relationship with the Starr Defendants, the Starr Defendants had a duty to provide the Wiatts with complete and accurate information about their financial, business and investment interests.  During this fiduciary relationship, the Starr Defendants had an ongoing obligation to supplement that information and correct any untrue or inaccurate statements based on information that became known to the Starr Defendants.

252.     As alleged in specific detail in paragraphs 126 through 156, the Starr Defendants negligently misrepresented to the Wiatts, affirmatively and by omission, that they were protecting their investment interests.

253.     In truth, the Starr Defendants were not protecting the Wiatts' investment interests. During January 2010, the Starr Defendants told the Wiatts they would invest their money with UBS; however, in truth they made the January Transfer for Starr's personal use.  The Starr Defendants had an obligation to disclose the January Transfer to the Wiatts.  The Starr Defendants knew or should have known that by failing to disclose this information to the Wiatts, they were misleading them by omission.

254.     Had the Starr Defendants employed due care, they would have discovered and known of their misstatements and omissions about the Wiatts' investments and disclosed them to the Wiatts.

255.     The Starr Defendants failed to disclose this information to the Wiatts despite ample opportunity to do so.

256.     The Starr Defendants knew, or should have known, that the Wiatts would rely upon their misrepresentations and omissions about their investments by refraining from demanding the return of their funds and continuing to use Starr's and Bristol's services.

257.     The Wiatts actually, reasonably, foreseeably and justifiably relied upon the Starr Defendants' misrepresentations and omissions about their investments, and permitted Starr and Bristol to remain in fiduciary relationships with them and to continue to provide them with advice and to maintain their accounts.

258.    As a direct and proximate result of the Starr Defendants misrepresentations and omissions, the Wiatts were induced to permit Starr to maintain their accounts, and have sustained damages in an amount no less than the $2 million stolen by Starr and Bristol.

259.    When the Wiatts' first questioned the Starr Defendants about the January Transfer, in or about March 2010, the Starr Defendants negligently misrepresented, affirmatively and by omission, that the wire transfers to the trust account were made to facilitate the bundling of investments with UBS (*i.e.*, the cover story).

260.    As set forth in detail in paragraphs 139 through 156, between March 2010 and May 2010, the Starr Defendants continued to use the false cover story about the January Transfer.  They also communicated the cover story to Bristol, who told the Wiatts the same false cover story.

261.    In truth, the Wiatts' funds had been misappropriated by Starr and not bundled for an investment with UBS.

262.    The Starr Defendants had no reasonable basis to believe that the Wiatts' funds had actually been bundled for an investment with UBS.  Had the Starr Defendants employed due care, they would have discovered and known of their misstatements and omissions about the January Transfer.

263.    The Starr Defendants knew, or should have known, that the Wiatts would rely upon their misrepresentations and omissions about their investments by delaying their demand for the return of their stolen funds and by maintaining their funds with Starr.

264.    The Wiatts actually, reasonably, foreseeably and justifiably relied upon the Starr Defendants' misrepresentations and omissions about the January Transfer and did not immediately demand that Starr return their funds or remove their funds from Starr.

265.     As a direct and proximate result of the Starr Defendants misrepresentations and omissions, the Wiatts lost $2 million in funds misappropriated by Starr.

266.     As set forth in detail in paragraphs 145 through 149, when Uma Thurman demanded the return of $1 million from Starr and Bristol, on April 26, 2010, the Starr Defendants induced the Wiatts to authorize the transfer of $2 million to UBS by misrepresenting, affirmatively and by omission, that the purpose of the transfer was for an investment with UBS.

267.     In truth, the purpose of the April Transfer was to conceal Starr's misappropriation of client funds by funneling the Wiatts' money to Uma Thurman.

268.     The Starr Defendants had no reasonable basis to believe that $2 million of the Wiatts' funds were invested with UBS.  Had the Starr Defendants employed due care, they would have discovered and known of their misstatements and omissions about the April Transfer.

269.     The Starr Defendants knew, or should have known, that the Wiatts would rely upon their misrepresentations and omissions about their investments by delaying their demand for the return of their stolen funds and by maintaining their remaining funds with Starr.

270.     The Wiatts actually, reasonably, foreseeably and justifiably relied upon the Starr Defendants' misrepresentations and omissions about the April Transfer and did not immediately demand that Starr return their funds or remove their funds from Starr.

271.     As a direct and proximate result of the Starr Defendants' misrepresentations and omissions, the Wiatts lost $2 million in funds misappropriated by Starr.

272.     If, at any time prior to May 27, 2010, Bristol and Winston & Strawn had disclosed the true nature of the January and April Transfers, the Wiatts could have successfully demanded and recovered their funds from Bristol and Starr, as did other Starr clients, or taken action to

freeze the Starr Defendants' and Bristol's bank accounts.  As late as May 4, 2010, Bristol still

had a balance of over $2 million in his Attorney Trust Account, and on that date he returned

money directly to certain Starr investors.

## COUNT VII
### (Fraud)
### (Against Bristol and Winston & Strawn)

273.     Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs

in Count V and VI above, as if fully set forth herein.

274.     In Starr's and Bristol's guilty plea agreements, they admitted to conspiring to

using Bristol's Attorney Trust Account to steal and launder Starr's client funds.

275.     By the illegal and fraudulent acts and schemes described above and admitted by

Starr and Bristol in their guilty pleas, in his capacity as a Capital Partner of Winston & Strawn,

Bristol willfully and intentionally defrauded Plaintiffs and made or caused to be made false,

fraudulent and material misrepresentations and omissions to Plaintiffs concerning wire transfers

and investments.

276.     When Bristol was taking these actions in the performance of legal services for the

Wiatts in myriad matters, he was acting within the scope of his employment at Winston &

Strawn.  His representation was of the kind that Bristol was employed by Winston & Strawn to

perform, and occurred substantially within the confines of the Winston & Strawn workday and

workspace.  Moreover, Bristol was motivated, at the very least in part, to serve Winston &

Strawn by fostering a relationship with a very well known public figure in Jim Wiatt, and his

wife Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to

more.

277.   As alleged in specific detail in paragraphs 94 through 125, starting in or about July 2009, Bristol conspired and agreed with Starr to use his Attorney Trust Account to receive unauthorized transfers of Starr's client funds, and to launder those funds for Starr's personal use.

278.   As alleged in specific detail in paragraphs 126 through 129, when the Wiatts approached Bristol about representing them in connection with their business and investment activities, Bristol knowingly misled the Wiatts about his relationship with Starr in order to induce them to become clients of Bristol and Winston & Strawn.

279.   As alleged in specific detail in paragraphs 126 through 156, while acting in his capacity as a Capital Partner of Winston & Strawn, Bristol intentionally misrepresented, affirmatively and by omission, that he was protecting their investment interests.

280.   As alleged in specific detail in paragraphs 103 through 110, when Bristol received the January Transfer into his Attorney Trust Account, Bristol knew that this money belonged to the Wiatts and that it was not an authorized transfer.  Bristol had an obligation to disclose the January Transfer to the Wiatts and despite ample opportunity he did not make such a disclosure, as alleged in specific detail in paragraphs 126 through 156.  Indeed, in March 2010, Bristol stated that he was continuing to protect the Wiatts' investment interests, but he still failed to disclose the January Transfer or the fact that Starr was using his Attorney Trust Account to make similar transfers.

281.   Bristol knew that by failing to disclose the January Transfer to the Wiatts, he was misleading them by omission.

282.   As alleged in specific detail in paragraphs 103 through 122, when Bristol received the April Transfer into his Attorney Trust Account, Bristol knew that this money belonged to the Wiatts and that it was not an authorized transfer.  Bristol had an obligation to disclose the April

Transfer to the Wiatts and despite ample opportunity he did not make such a disclosure, as alleged in specific detail in paragraphs 126 through 156.

283. Bristol knew that by failing to disclose the April Transfer to the Wiatts, he was misleading them by omission.

284. Bristol and Winston & Strawn knew that the Wiatts would rely upon Bristol's misrepresentations and omissions about protecting their investment interests by continuing to use Bristol's and Starr's legal and fiduciary services.

285. The Wiatts actually, reasonably, foreseeably and justifiably relied upon Bristol's misrepresentations and omissions about their investment interests, and permitted Starr and Bristol to remain in fiduciary relationships with them and to continue to provide them with advice and to maintain their accounts.

286. As a direct and proximate result of Bristol's and Winston & Strawn's misrepresentations and omissions, the Wiatts were induced to permit Starr and Bristol to maintain their accounts, and have sustained damages in an amount no less than the $2 million stolen by Starr and Bristol. Had the Wiatts known of the January and April Transfers, the Wiatts would have withdrawn their funds from Starr and engaged a different law firm to represent their business and investment interests.

287. As alleged in specific detail in paragraphs 139 through 156, while acting in his capacity as a Capital Partner of Winston & Strawn, Bristol adopted and was complicit in the Starr Defendants' cover story about the January Transfer and all of their false statements to the Wiatts that the wire transfers into the Attorney Trust Account were made to facilitate the bundling of investments with UBS, and that this was a routine practice.

288.     On or about May 12, 2012, Bristol falsely told the Wiatts that the January Transfer had been for the purpose of bundling their money for an investment with UBS, using the same false cover story provided by the Starr Defendants to the Wiatts in previous months. Bristol knew that this statement was false.

289.     In truth, the Wiatts' funds had been misappropriated by Starr and not bundled for an investment with UBS.

290.     By adopting the Starr Defendants' cover story, Bristol became liable not only for his false statements on May 12, 2010, but for all of the Starr Defendants' false statements about bundling the Wiatts' money for an investment with UBS, as alleged in specific detail in paragraphs 139 through 156, as well his omissions during that time, because, by adopting the cover story, Bristol revealed that he participated in a common scheme with the Starr Defendants to conceal the theft of the Wiatts' money during those months.

291.     Bristol and Winston & Strawn knew that the Wiatts' funds had not actually been bundled for an investment with UBS.

292.     Bristol and Winston & Strawn knew that the Wiatts would rely upon Bristol's and Winston & Strawn's misrepresentations and omissions about their investments by delaying their demand for the return of their funds.

293.     The Wiatts actually, reasonably, foreseeably and justifiably relied upon Bristol's misrepresentations and omissions about their investments and did not immediately demand that Bristol or Starr return their funds.

294.     As a direct and proximate result of Bristol's and Winston & Strawn's misrepresentations and omissions, the Wiatts lost $2 million in funds misappropriated by Starr.

295.    If, at any time prior to May 27, 2010, Bristol and Winston & Strawn had disclosed the true nature of the January and April Transfers, the Wiatts could have successfully demanded and recovered their funds from Bristol and Starr, as did other Starr clients, or taken action to freeze Bristol's and the Starr Defendants' bank accounts.  As late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account, and on that date he returned money directly to certain Starr investors.

296.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT VIII
### (Fraud)
### (Against Starr Defendants)

297.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count V and VI above, as if fully set forth herein.

298.    In Starr's and Bristol's guilty plea agreements, they admitted to conspiring to use Bristol's Attorney Trust Account to steal and launder Starr's client funds.

299.    By the illegal and fraudulent acts and schemes described above, the Starr Defendants willfully and intentionally defrauded the Wiatts and made or caused to be made false, fraudulent and material misrepresentations and omissions to the Wiatts concerning wire transfers and investments.

300.    For many years, the Starr Defendants have managed the Wiatts business and investment activities and have acted as fiduciaries to the Wiatts, protecting their financial, business and investment interests, as alleged in specific detail in paragraphs 33 through 42.

301.    Based on the Wiatts' fiduciary relationship with the Starr Defendants, the Starr Defendants had a duty to provide the Wiatts with complete and accurate information about the Wiatts' financial, business and investment interests.  During this fiduciary relationship, the Starr Defendants had an ongoing obligation to supplement that information and correct any untrue or inaccurate statements based on information that became known to the Starr Defendants.

302.    As alleged in specific detail in paragraphs 126 through 156, the Starr Defendants intentionally misrepresented to the Wiatts, affirmatively and by omission, that they were protecting their investment interests.

303.    In truth, the Starr Defendants were not protecting the Wiatts' investment interests. During January 2010, the Starr Defendants told the Wiatts they would invest their money with UBS; however, in truth they made the January Transfer for Starr's personal use.  The Starr Defendants had an obligation to disclose the January Transfer to the Wiatts.  The Starr Defendants knew that by failing to disclose this information to the Wiatts, they were misleading them by omission.

304.    The Starr Defendants failed to disclose this information to the Wiatts despite ample opportunity to do so.

305.    The Starr Defendants knew that the Wiatts would rely upon their misrepresentations and omissions about their investments by refraining from the demanding the return of their funds and continuing to use Starr's and Bristol's services.

306.    The Wiatts actually, reasonably, foreseeably and justifiably relied upon the Starr Defendants' misrepresentations and omissions about their investments, and permitted Starr and Bristol to remain in fiduciary relationships with them and to continue to provide them with advice and maintain their accounts.

307.    As a direct and proximate result of the Starr Defendants misrepresentations and omissions, the Wiatts were induced to permit Starr to maintain their accounts, and have sustained damages in an amount no less than the $2 million stolen by Starr and Bristol.

308.    As alleged in specific detail in paragraphs 139 through 142, when the Wiatts' first questioned the Starr Defendants about the January Transfer, in or about March 2010, in order to hide Starr's and Bristol's fraud, the Starr Defendants misrepresented, affirmatively and by omission, that the wire transfers to the trust account were made to facilitate the bundling of investments with UBS (*i.e.*, the cover story),

309.    As alleged in specific detail in paragraphs 139 through 156, between March 2010 and May 2010, the Starr Defendants continued to use this cover story in making false statements to the Wiatts, affirmatively and by omission, about the January Transfer.  They also communicated the cover story to Bristol, who told the Wiatts the same false cover story.

310.    In truth, the Wiatts' funds had been misappropriated by Starr and not bundled for an investment with UBS.

311.    The Starr Defendants knew that the Wiatts' funds had not actually been bundled for an investment with UBS.

312.    The Starr Defendants knew that the Wiatts would rely upon their misrepresentations and omissions about their investments by delaying their demand for the return of their stolen funds and by maintaining their funds with Starr.

313.     The Wiatts actually, reasonably, foreseeably and justifiably relied upon the Starr Defendants' misrepresentations and omissions about the January Transfer and did not immediately demand that Starr return their funds or remove their remaining funds from Starr.

314.     As a direct and proximate result of the Starr Defendants misrepresentations and omissions, the Wiatts lost $2 million in funds misappropriated by Starr.

315.     As alleged in specific detail in paragraphs 145 through 149, when Uma Thurman demanded the return of $1 million from Starr and Bristol, on April 26, 2010, the Starr Defendants induced the Wiatts to authorize the transfer of $2 million to UBS by misrepresenting, affirmatively and by omission, that the purpose of the transfer was for an investment with UBS.

316.     In truth, the purpose of the transfer was to conceal Starr's misappropriation of client funds by funneling the Wiatts' money to Uma Thurman.

317.     The Starr Defendants knew that the Wiatts' funds were not actually used for an investment with UBS.

318.     The Starr Defendants knew that the Wiatts would rely upon their misrepresentations and omissions about their investments by delaying their demand for the return of their stolen funds and by maintaining their funds with Starr.

319.     The Wiatts actually, reasonably, foreseeably and justifiably relied upon the Starr Defendants' misrepresentations and omissions about the April Transfer and did not immediately demand that Starr return their funds or remove their funds from Starr.

320.     As a direct and proximate result of the Starr Defendants' misrepresentations and omissions, the Wiatts lost $2 million in funds misappropriated by the Starr Defendants.

321.     If, at any time prior to May 27, 2010, Bristol and Winston & Strawn had disclosed the true nature of the January and April Transfers, the Wiatts could have successfully demanded

and recovered their funds from Bristol and Starr, as did other Starr clients, or taken action to freeze the Starr Defendants' and Bristol's bank accounts.  As late as May 4, 2010, Bristol still had a balance of over $2 million in his Attorney Trust Account, and on that date he returned money directly to certain Starr investors.

### COUNT IX
### (Civil Conspiracy)
### (Against All Defendants)

322.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count V and VI, as if fully set forth herein.

323.    In Starr's and Bristol's guilty plea agreements, they admitted to conspiring to use Bristol's Attorney Trust Account to steal and launder Starr's client funds.

324.    Starr and Bristol's scheme lasted from July 2009 to May 2010.  During that scheme, they used Bristol's Attorney Trust Account to steal and launder nearly $20 million of Starr's client funds, including $2 million which they knew belonged to the Wiatts.

325.    When Bristol was engaged in this scheme, in the performance of legal services for the Wiatts in myriad matters, he was acting within the scope of his employment at Winston & Strawn.  His representation was of the kind that Bristol was employed by Winston & Strawn to perform, and occurred substantially within the confines of the Winston & Strawn workday and workspace.  Moreover, Bristol was motivated, at the very least in part, to serve Winston & Strawn by fostering a relationship with a very well known public figure in Jim Wiatt, and his wife Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to more.

326.    As alleged in specific detail in paragraphs 94 through 125, in committing the wrongful acts admitted by Starr and Bristol in their criminal guilty pleas, the Starr Defendants,

Bristol and Winston & Strawn have pursued a common course of conduct, acted in concert with, and have conspired and agreed with one another in furtherance of their common plan, scheme and design to injure the Wiatts and other clients of Starr for the benefit of all of the Defendants.

327.    Defendants have taken overt acts in furtherance of their common scheme, as admitted in their criminal plea agreements. While Bristol was working as a Capital Partner at Winston & Strawn, Bristol conspired with and helped Starr to defraud his clients and conceal his criminal conduct by using his Attorney Trust Account to make the unauthorized January and April Transfers of the Wiatts' money.

328.    As alleged in specific detail in paragraphs 94 through 125, knowing that the Wiatts and other Starr clients had not authorized the transfer of their funds, Defendants acted in concert to transfer Starr's clients' funds to the Attorney Trust Account, and then transferred the funds to the Starr Defendants to pay the Starr companies' operating expenses, pay a settlement in a dispute being handled by Bristol and Winston & Strawn, pay Starr's overdue legal fees to Winston & Strawn, purchase a luxury apartment for Starr, and repay other clients of Starr.  This scheme was directly financially rewarding to Starr and generated additional client billable business for Bristol and Winston & Strawn.

329.    As a direct and proximate result of Defendants' acts of conspiracy, Plaintiffs lost $2 million of funds held by Starr and have sustained damages in an amount to be determined at trial.

330.    Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because

Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT X
### (Conspiracy to Defraud)
### (Against All Defendants)

331.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count V, Count VI, as if fully set forth herein.

332.    Through a series of activities outlined above in Count IX, Defendants entered into an agreement with a common design to defraud Plaintiffs.

333.    Each of Defendants willfully and knowingly agreed and conspired with other Defendants to commit the above referenced acts of fraud, including wire fraud and money laundering, for an unlawful purpose, as set forth in specific detail in paragraphs 94 through 125.

334.    Defendants are each equally and vicariously liable to Plaintiffs for their damages.

335.    By reason of the aforesaid conspiracy, Plaintiffs have suffered the following damages that were proximately caused by the overt acts of one or more Defendants in furtherance of the conspiracy:

(a)     the loss of moneys transferred from their account that have not been returned;

(b)     injury to Plaintiffs' business reputations;

(c)     the loss of at least one business opportunity and profits; and

(d)     other consequential, incidental and special damages.

336.    In addition, Defendants acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because

Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

### COUNT XI
### (Violation of 18 U.S.C. § 1962(c) (RICO))
### (Against All Defendants)

337.    Plaintiffs incorporate by reference all paragraphs above, except for the paragraphs in Count V and VI, as if fully set forth herein.

338.    18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

339.    All Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

340.    In violation of the above-mentioned statute, Defendants associated with the Starr Enterprise, which was an association in fact consisting of Defendants together and with other persons not known to Plaintiffs.

341.    When Bristol acted in association with these Defendants, in his performance of legal services for the Wiatts and the Starr Defendants in myriad matters, he was acting within the scope of his employment at Winston & Strawn.  His representation was of the kind that Bristol was employed by Winston & Strawn to perform, and occurred substantially within the confines of the Winston & Strawn workday and workspace.  Moreover, Bristol was motivated, at the very least in part, to serve Winston & Strawn by increasing his billable business with the Starr Defendants and fostering a relationship with a very well known public figure in Jim Wiatt, and his wife Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to more.

342.    As set forth in specific detail in paragraphs 94 through 125, the Starr Enterprise shared the common purpose of misappropriating money from Starr's investor client, using the Attorney Trust Account of a Capital Partner at Winston & Strawn to conceal the misappropriation, and improperly diverting that money for the use of the Starr Enterprise, including, for example, the Starr Entities' operating costs, legal fees for the services of Winston & Strawn (to represent Starr in an SEC investigation into the Starr Enterprise's activities and Starr's legal disputes with his clients), and funding the Starr Enterprise's settlement of legal disputes.

343.    The Starr Enterprise existed for at least ten continuous months, which was ample time for the enterprise to pursue its illegal purposes, and which resulted in the theft and laundering of nearly $20 million of funds stolen from Starr's clients.

344.    The Starr Enterprise's theft and laundering of Starr's clients' investment funds affected interstate commerce.  For example, Starr's wire transfers to Bristol sent money across State lines from New York to New Jersey.

345.    Each Defendant conducted and participated in the conduct of the affairs of the Starr Enterprise and played a central role in the management and/or operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and money laundering.  Winston & Strawn was central to the Starr Enterprise because its Capital Partner Bristol was central to the enterprise, and Bristol participated in the enterprise in order to increase his billable business for Winston & Strawn, settle legal matters being handled by Winston & Strawn, and pay the legal fees of Winston & Strawn.

346.    Further, when Bristol was engaged in this unlawful racketeering activity, in the performance of legal services for the Wiatts and Starr in myriad matters, he was acting within the

scope of his employment at Winston & Strawn.  His representation was of the kind that Bristol

was employed by Winston & Strawn to perform, and occurred substantially within the confines

of the Winston & Strawn workday and workspace.  Moreover, Bristol was motivated, at the very

least in part, to serve Winston & Strawn by increasing his billable business from Starr and

fostering a relationship with a very well known public figure in Jim Wiatt, and his wife

Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to more.

347.     This pattern of racketeering included the following illegal acts defined as at least

two predicate acts of RICO liability under 18 U.S.C. § 1961 within a ten (10) year period,

including, but not limited to the following, which formed the basis for Kenneth Starr's October

5, 2010 plea:

(a)      Wire fraud, as defined by 18 U.S.C. § 1343, in that for the purposes of

executing Defendants' scheme and artifice to defraud, and to obtain money by means of false

and fraudulent pretenses, representations, and promises, Defendants did transmit and cause to be

transmitted by means of wire in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, specifically, the Starr

Defendants controlled millions of dollars belonging to Plaintiffs and in each instance where the

Starr Defendants executed a wire transfer in New York in January 2010 and April 2010 that

transferred a total of $2,000,000 of Plaintiffs' funds to Defendant Bristol's Attorney Trust

Account in New Jersey, Defendants misappropriated Plaintiffs' funds, all while failing to

disclose the existence of these wire transfers and, when questioned, making material

misrepresentations about the true purposes of the wire transfers; and

(b)      Money laundering, as defined by 18 U.S.C. § 1956(a)(1), in that

Defendants unlawfully and willfully, knowing that the property involved in certain financial

transactions represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct financial transactions which in fact involved the proceeds of specified unlawful activity, specifically, Defendants received proceeds from the January 2010 and April 2010 wire transfers to Defendant Bristol's Attorney Trust Account in New Jersey, with the intent to promote the carrying on of specified unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity in misappropriating Plaintiffs' funds and writing them to the trust account before diverting them to their ultimate destination to make it appear as if the funds were being directed to lawful and appropriate investments and were being received from a lawful and appropriate source.

348.    The foregoing predicate acts of racketeering activity conducted by Defendants through the Starr Enterprise were corroborated by Bristol's guilty plea to conspiring with Starr for the purpose of laundering money to conceal the fraudulent activities of the Starr Enterprise.

349.    The foregoing predicate acts of racketeering activity conducted by Defendants through the Starr Enterprise caused Plaintiffs to lose money and business opportunities.  The members of the Starr Enterprise were illicitly enriched through the receipt of funds transferred from Plaintiffs' account.

350.    By reason of the foregoing violations of 18 U.S.C. § 1962(c) Plaintiffs have suffered the following foreseeable losses and damages:

    (a)    the loss of moneys transferred from their account that has not been returned;

    (b)    injury to Plaintiffs' business reputations;

    (c)    loss of  at least one business opportunity and profits; and

    (d)    other consequential, incidental and special damages.

351.    In addition, Defendants also acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT XII
## (Violation of 18 U.S.C. §  1962(d) (RICO))
## (Against All Defendants)

352.    Plaintiffs incorporate by reference all paragraphs above, other than the paragraphs in Count V and VI, as if fully set forth herein.

353.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection. . . (c) of this section."  Through a series of activities outlined above in Count XI, Defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above.

354.    Each Defendant willfully and knowingly agreed and conspired with other Defendants to commit the above referenced predicate acts of wire fraud and money laundering, as set forth in guilty pleas of Starr and Bristol.

355.    Winston & Strawn was central to the Starr Enterprise because its Capital Partner Bristol was central to the enterprise, and Bristol participated in the enterprise in order to increase his billable business for Winston & Strawn, settle legal matters being handled by Winston & Strawn, and pay the legal fees of Winston & Strawn.

356.    Further, when Bristol was engaged in this unlawful conspiracy, in the performance of legal services for the Wiatts and Starr in myriad matters, he was acting within the scope of his employment at Winston & Strawn.  His representation was of the kind that Bristol

74

was employed by Winston & Strawn to perform, and occurred substantially within the confines of the Winston & Strawn workday and workspace.  Moreover, Bristol was motivated, at the very least in part, to serve Winston & Strawn by increasing his billable business from Starr and fostering a relationship with a very well known public figure in Jim Wiatt, and his wife Elizabeth, that did in fact lead to other engagements with the Wiatts and could have led to more.

357.    By reason of the aforesaid violations of 18 U.S.C. § 1962(d) Plaintiffs have suffered the following foreseeable losses and damages:

(a)    the loss of moneys transferred from their account that has not been returned;

(b)    injury to Plaintiffs' business reputations;

(c)    loss of  at least one business opportunity and profits; and

(d)    other consequential, incidental and special damages.

358.    In addition, Defendants acted with malice and/or wanton and willful disregard of the foreseeable harm to Plaintiffs.  They were well aware of the likelihood that serious economic harm to Plaintiffs would arise from their egregious conduct and/or actions.   As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Defendants should be punished for their egregious misconduct and to deter them and others in their positions from acting the same way in the future.

## COUNT XIII
### (Conversion)
### (Against All Defendants)

359.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

360.    Bristol's and Starr's criminal plea agreements admit that they exercised unauthorized dominion and control over $2 million of the Wiatts' funds, and transferred those funds to other accounts for Starr's personal use.

361.    Defendants had no legal or equitable rights to Plaintiffs' funds in the Managed Account.

362.    Bristol exercised control and dominion over his Attorney Trust Account in his capacity as a Capital Partner of Winston & Strawn, with the knowledge of Winston & Strawn. Bristol operated the Attorney Trust Account for the benefit of Starr, at the time one of Winston & Strawn's important clients, responsible for over $1 million of billable business in 2009 alone. On two occasions, Bristol used his Attorney Trust Account to pay Winston & Strawn's overdue legal bills for Starr by $100,000 check from his Attorney Trust Account to Winston & Strawn.

363.    Bristol also used his Attorney Trust Account to transfer $4 million to Neil Simon, including $1 million belonging to the Wiatts, in settlement of a dispute being handled for Starr by Winston & Strawn.  In making that settlement transfer, Bristol acted with the knowledge and apparent authority of Winston & Strawn.

364.    In April 2010, Uma Thurman's counsel reached out to Bristol, in his capacity as a Capital Partner of Winston & Strawn, in order to demand that Starr return $1 million of Uma Thurman's money.  Again, Bristol used his Attorney Trust Account to take possession of the Wiatts' funds for the benefit of Starr, an important client of Winston & Strawn.

365.    Defendants, through their unethical and unlawful conduct, as set forth above, caused Plaintiffs to lose at least $2,000,000 that was transferred to Bristol's Attorney Trust Account, with the knowledge and under the apparent authority of Winston & Strawn, and it has never been returned.

366.    By virtue of the foregoing, the Defendants have exercised an act of unauthorized dominion over Plaintiffs' monies in denial of Plaintiffs' clear, uncontroverted, and unequivocal

right to such monies – that is to say, converted Plaintiffs' $2,000,000, thereby greatly damaging and injuring Plaintiffs.

367.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have suffered damages in an amount that has yet to be ascertained.

## COUNT XIV
### (Negligent Supervision)
### (Against Winston & Strawn)

368.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

369.    At all relevant times, Bristol was a Capital Partner of Winston & Strawn, and Winston & Strawn had a duty and the ability to supervise and control Bristol.

370.    While working as a Capital Partner, Bristol conspired and agreed with Winston & Strawn's client, Starr, to defraud Starr's clients and launder their money through his Attorney Trust Account, as alleged in specific detail in paragraphs 94 through 125.

371.    From in or about July 2009 through May 2010, Bristol used his Attorney Trust Account to help a Winston & Strawn client, Starr, steal and launder nearly $20 million from Starr's clients, including $2 million from a second Winston & Strawn client, the Wiatts.

372.    Winston & Strawn knew or should have known that one of its Capital Partners was conspiring with one of its clients to defraud his investors out of nearly $20 million, using his Attorney Trust Account to launder that money, because during that 10 months Winston & Strawn should have realized that its Capital Partner was using firm resources and spending firm time committing such a massive fraud.

373.    Moreover, Winston & Strawn knew or should have known that one of its Capital Partners was conspiring with one of the firm's clients to defraud a second firm client, on two occasions, because Winston & Strawn should have reasonable protections in place to make sure

that its attorney, including Capital Partners, are never in a position to help one client steal from another client. At the very least, after the first theft, Winston & Strawn should have discovered and put a stop to the second theft.

374. By at least March 2010, Winston & Strawn knew or should have known that Bristol might engage in this injurious conduct against third persons because Winston & Strawn knew that (i) Starr was under SEC investigation for misappropriating client funds, (ii) Starr had been accused of improper investment activities by one of his former clients, (iii) Starr was having trouble paying his legal bills to Winston & Strawn, (iv) Bristol maintained funds for Starr in an Attorney Trust Account, (v) and Bristol used his Attorney Trust Account to pay Starr's overdue legal fees, including by payment of $200,000 to Winston & Strawn using two $100,000 checks payable from Bristol's Attorney Trust Account.

375. Knowing these facts, Winston & Strawn was on notice of and had an obligation to investigate Bristol's activities, and, if it had conducted even a reasonably diligent investigation, or indeed any monitoring of its Capital Partners activities, Winston & Strawn would have discovered that Bristol was, in fact, engaged in improper and injurious conduct toward third parties by laundering money through his Attorney Trust Account. Winston & Strawn would have discovered at least that (i) Bristol was simultaneously and improperly representing the Starr Defendants and the Wiatts for approximately eight months, and (ii) during that time, Bristol used his Attorney Trust account to help Starr steal from the Wiatts and then transfer their funds to settle Starr's dispute with a former client (in a matter being handled by Winston & Strawn).

376. Further, by April 2010, attorneys of another law firm learned of Bristol's role in helping Starr steal $1 million from Uma Thurman and they contacted Bristol at his Winston & Strawn office and demanded the return of Ms. Thurman's money, all of which should have put

78

Winston & Strawn on notice of Bristol's propensity to commit injurious conduct toward third parties. Nevertheless, after being contacted by that law firm, Bristol again took $1 million from one firm client, the Wiatts, to pay the debt of a second firm client, the Starr Defendants.

377.    As a direct and proximate result of Winston & Strawn's negligence, the Wiatts were injured due to the diversion of their funds through Bristol's Attorney Trust Account. If at any time during Bristol's and Starr's scheme, Winston & Strawn had put a stop to their tortious conduct, the Wiatts would not have lost their money, or would have demanded and recovered their money from Bristol and Starr, as did other Starr clients, or taken action to freeze the Starr Defendants' and Bristol's bank accounts.

**COUNT XV**
**(Accounting)**
**(Against All Defendants)**

378.    Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

379.    A fiduciary relationship exists between Plaintiffs and Defendants.

380.    Defendants had access to Plaintiffs' accounts from which Defendants took $2,000,000.

381.    By virtue of the foregoing, each Defendant must be compelled to provide an accounting of their personal accounts, business accounts, and trust accounts to discover the whereabouts of Plaintiffs' funds.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs respectfully request that the Court:

(a)    Order that the Starr Defendants account to Plaintiffs for all fees, profits or financial or non-financial benefits arising from or in any way received in connection with the foregoing wrongful and unlawful acts of Defendants and that, in accordance with such accounting, Plaintiffs be awarded judgment for such fees, profits or benefits;

(b)      Order that Defendants pay Plaintiffs any and all damages sustained by Plaintiffs arising from the foregoing wrongful and unlawful acts of Defendants;

(c)      Order that Defendants promptly deliver to Plaintiffs a complete accounting of all transactions involving each of Plaintiffs from the commencement of Defendants' employment on behalf of Plaintiffs;

(d)      Order that all Defendants be required to return all professional fees, from at least 2009 to the present, received by them while they were in material breach of their fiduciary duties set forth above;

(e)      Order that Defendants promptly turn over to Plaintiffs copies of all personal books, records, documents and tax returns belonging to Plaintiffs that have not yet been turned over to Plaintiffs;

(f)      Order that Plaintiffs be awarded their costs and reasonable attorneys' fees incurred in connection with the institution and prosecution of this civil action;

(g)      Award Plaintiffs punitive damages as to Counts II, VII, VIII, IX, X, XI, XII, and XIII in an amount to be determined at trial; and

(h)      Order such other and further relief as justice may require.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

/s/ David S. Stone

Dated: August 22, 2011

David S. Stone
Robert A. Magnanini
Amy Walker Wagner
Jason C. Spiro
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, NJ 07078
Tel: (973) 218-1111

80

Fax: (973) 218-1106

***Attorneys for Plaintiffs James A. Wiatt
and Elizabeth Rieger Wiatt***